Edward J. Guza, *Esq.*
25 Apex Dr., Ste. A
Bozeman, MT 59718
(406)586-2228
eguza@ejguzalaw.com
Bar No. 5008

Attorneys for Plaintiff, Petra Inc.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MONTANA**

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| CHRISTIAN MARK MCCOY | : | Case No. 2:25-bk-20080-BPH |
| Debtor. | : | |
| PETRA, INC, an Idaho corporation | : | |
| Plaintiff, | : | |
| v. | : | |
| CHRISTIAN MARK MCCOY | : | Adv. Pro. No. ________________ |
| Defendant. | : | |

## COMPLAINT OBJECTING TO DEBTOR'S DISCHARGE OF DEBT

Plaintiff Petra Inc., by and through undersigned counsel, hereby submits this complaint ("Complaint") objecting to the discharge of Defendant Christian Mark McCoy pursuant to Sections 523(a)(2), (a)(4), and/or (a)(6) of the Bankruptcy Code and F.R.B.P. § 4004, and hereby complain and allege against Defendant as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Petra is a validly registered Idaho corporation with a mailing address at 1097 N. Rosario St., Ste. 200, Meridian, ID 83642.

2. Defendant Christian Mark McCoy ("McCoy" or "Debtor") is an individual who resides at 57 Prospector Trial, Bozeman, MT 59718.

3. Richard J. Samson is the duly appointed Chapter 7 Trustee of the Debtor's bankruptcy estate (the "**Trustee**").

4. This Court has jurisdiction over the above-captioned bankruptcy case (the "Chapter 7 Case") and this adversary proceeding ("Adversary Proceeding") pursuant to 28 U.S.C. §§ 157(b), 1331, and 1334(b); 11 U.S.C. § 523; and F.R.B.P. § 7001(4).

5. This Adversary Proceeding commences pursuant to Section 523(c) of the Bankruptcy Code and F.R.B.P. §§ 4007 and 7001(4).

6. This Adversary Proceeding is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(A), (I), and (J) and arises in and is related to the Chapter 7 Case.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a) because the Chapter 7 Case was filed in this District and is pending before this Court.

8. Pursuant to F.R.B.P. § 7008, Plaintiff consent to entry of final orders or judgment by the bankruptcy court.

## GENERAL ALLEGATIONS

9. McCoy is the registered agent of McCoy Excavation, LLC.

10. Upon information and belief, McCoy is the sole owner and managing member of McCoy Excavation.

11. McCoy exercises control over the finances and operations of McCoy Excavation.

12. On or about May 13, 2021, Petra entered into a construction contract with Bozeman West Apartments, LP to be the general contractor for a multi-building, 216-unit apartment complex ("**Project**") at 2235 Tschache Ln., Bozeman, MT ("**Project Site**").

13. On or about July 13, 2021, Petra entered into a subcontract ("**Subcontract**") with McCoy Excavation. A true and accurate copy of the Subcontract is attached hereto as Exhibit 1.

14. The Subcontract included a "time is of the essence" provision. Exhibit 1 at 7, 22.

15. Per the terms of the Subcontract, McCoy Excavation agreed to "provide all labor, equipment and materials for all Earthwork, Exterior Improvements, Site Concrete, Asphalt Paving, Striping, Signage & Utilities" for the Project.

16. The full scope of McCoy Excavation's work was outlined in further detail in the Subcontract, and included "all piping" for (1) "all water and fire lines and connect to mains as required – including taps," (2) "all storm drain system," and (3) "sanitary sewer lines of all types and sizes." Exhibit 1 at 25-26.

17. The timely procurement and installation of utility, storm water, and sanitary sewer, and related underground piping necessary for initial site work and excavation for the Project were critical to maintain the Project schedule.

18. After the Subcontract was executed, Mr. McCoy represented that McCoy Excavation was unable to secure the necessary credit from a supplier to purchase the necessary piping for the Project.

19. To facilitate McCoy Excavation's acquisition of the piping for the Project, Petra permitted McCoy Excavation to submit a payment application for the funds necessary to purchase the piping.

20. On or about July 31, 2021, McCoy Excavation submitted its first Application for Payment ("**Pay App 1**"). A true and accurate copy of Pay App 1 is attached hereto as Exhibit 2.

21. The total amount of the Pay App 1 was $413,827.00. The $413,827.00 was comprised of $25,000.00 for mobilization, $129,609.00 for "Sanitary Sewer," $129,609.00 for "Water/Fire," and $129,609.00 for "Storm Sewer." Exhibit 2 at 2.

22. On or about August 4, 2021, Mr. McCoy executed Pay App 1, which included representations that McCoy Excavation agreed "[t]hat said payment shall be received as a trust fund and applied by the undersigned, first for the discharge of his obligations for all labor, subcontract work, materials, equipment, supplies, services, sales taxes, use taxes, payroll taxes, etc. in connection with this project." Exhibit 2 at 1.

23. McCoy executed Pay App 1 to induce Petra to approve and issue payment for the amounts set forth therein.

24. On or about August 4, 2021, McCoy signed a Conditional Waiver and Release of Lien for $393,135.65.

25. On or about August 15, 2021, Petra approved Pay App 1 and issued payment to McCoy Excavation totaling $393,135.65

26. Of the $393,135.65 paid to McCoy Excavation, $388,827.00 was an advance of funds to procure piping for the Project.

27. McCoy Excavation never delivered any piping to the Project Site.

28. McCoy, acting on behalf of McCoy Excavation, represented that McCoy Excavation would use funds advanced by Petra to procure the piping on the Project.

29. McCoy did not use the advanced funds provided to purchase piping or for any other work or services for the benefit of the Project.

30. McCoy's representation that the funds Plaintiff provided would be used to purchase piping was material.

31. McCoy knew such representation regarding the purchase of piping was false.

32. McCoy intended that Petra would rely on the statement, and in so doing pay McCoy Excavation.

33. Petra was unaware that McCoy did not intend to purchase piping with the money advanced to Respondents.

34. Petra relied on McCoy's representations regarding the future purchase of piping for the Project.


2:25-ap-02008-BPH Doc#: 1 Filed: 08/05/25 Page 5 of 105

35. Petra's reliance on McCoy's representation was reasonable.

36. Petra paid money to McCoy Excavating for the piping and was damaged when the funds were not used to purchase the piping.

37. McCoy is personally liable for his own intentional and wrongful acts, conversions, misappropriations, and breaches of independent duties owed to Petra, as detailed above. In the alternative, McCoy is personally liable as the alter-ego of McCoy Excavation

38. In or about August 2021, agents of Petra observed that McCoy Excavation was not providing sufficient manpower to complete necessary work in a timely manner.

39. Due to McCoy Excavation's lack of manpower, work on the excavation was slower than scheduled and delaying the Project.

40. Petra notified McCoy Excavation that it needed to provide more manpower to avoid further delays.

41. On or about August 23, 2021, Petra provided its first 48 Hour Notice of Default to McCoy Excavation, a true and correct copy of which attached hereto as Exhibit 3.

42. Petra's first 48 Hour Notice stated that McCoy Excavation was in default of the Subcontract by failing to provide adequate manpower on the Project and falling behind schedule on the mass excavation.

43. Petra directed McCoy Excavation to cure those defaults and provide a recovery plan detailing how McCoy Excavation would remedy the stated Subcontract defaults.

44. McCoy Excavation failed to provide Petra with a recovery plan within forty-eight hours of the delivery of the first 48 Hour Notice or at any point thereafter.

45. McCoy Excavation failed to cure the stated defaults within forty-eight hours of the delivery of the first 48 Hour Notice

46. The Subcontract required McCoy Excavation to provide sufficient, properly trained manpower to conform with the Project schedule. Exhibit 1 at 15.

47. The Subcontract further states that failure to provide sufficient manpower is a breach of the Subcontract.

48. In the event of such failure to provide sufficient manpower, Petra could avail itself of various remedies, including, but not limited to: Supplying its own workers and holding McCoy Excavation liable for the damages, overhead and profit; Withholding payment to McCoy Excavation; or, Terminating the Subcontract and holding McCoy Excavation liable for costs, expenses, and any other actual or consequential damages.

49. In the Subcontract, McCoy Excavation provided the names of suppliers for materials on the Project. Exhibit 1 at 40. McCoy Excavation specified "Core + Main" as a supplier. Core + Main was designated as the piping supplier for McCoy Excavation's work on the Project.

50. In or about September 2021, Petra contacted Core + Main regarding the piping and learned that McCoy Excavation had not ordered the piping for the Project.

51. In or about September 2021, Petra requested confirmation that McCoy Excavation had ordered piping for the Project.

52. McCoy Excavation failed to provide Petra with any confirmation of ordering the piping and no piping was delivered to the Project Site from McCoy or its suppliers.

53. In or about September 17, 2021, Petra observed that McCoy Excavation did not have any workers present at the Project Site.

54. On or about October 29, 2021, Petra provided its second 48 Hour Notice to McCoy Excavation, a true and accurate copy of which is attached hereto as Exhibit 4.

55. Petra's second 48-Hour Notice stated that McCoy Excavation was in default of the Subcontract by:

a. Failing to provide adequate manpower on the Project;

b. Falling behind schedule on numerous work items, including erosion control, SWPPP work, site excavation, demolition, and subgrade preparation work;

c. Failing to procure necessary material, including piping;

d. Failing to take necessary actions to remedy delays following the receipt of written notice of such delays; and, Failing to take necessary action to provide increased manpower following the receipt of written notice of failure to prosecute work with promptness and diligence.

56. McCoy Excavation failed entirely to respond to the second 48-Hour Notice of Default and failed cure or attempt to cure the various breaches of the Subcontract.


2:25-ap-02008-BPH Doc#: 1 Filed: 08/05/25 Page 8 of 105

57. On or about January 10, 2022, Petra sent a Notice of Termination to McCoy Excavation. A true and accurate copy of the Notice of Termination is attached hereto as Exhibit 5.

58. The Notice of Termination stated that the grounds for termination of the Subcontract included:

59. Failure to procure materials, including piping;

60. Failure to provide sufficient manpower to maintain the Project schedule;

61. Failure to account for the advancement of funds for the utility piping; and,

62. Failure to cure breaches detailed in the first and second 48-Hour Notices.

63. Upon information and belief, and based on the facts set forth above, Mr. McCoy is an insider and alter ego of McCoy Excavation and justice requires that McCoy be jointly responsible for the debts and liabilities of McCoy Excavation.

64. Upon information and belief, and based on the facts set forth above, McCoy has exercised, and continues to exercise, substantial control over McCoy Excavation, uses McCoy Excavation to transact his personal business, and treats funds belonging to McCoy Excavation as though they were his own. McCoy has exerted complete autonomy and control over McCoy Excavation and exerted domination over its policies, finances, and business practices, such that McCoy Excavation does not have an identity independent of McCoy.

65. McCoy Excavation is therefore a mere instrumentality for the transaction of McCoy's own affairs, and there is such a unity of interest in ownership that the separate personalities of Mr. McCoy and McCoy Excavation no longer exist.

66. Justice therefore requires recognizing the substance of the relationship over the corporate form because Mr. McCoy has used the corporate fiction to commit torts and perpetuate a fraud.

67. An equitable result will be achieved by disregarding the corporate form of McCoy Excavation and holding Mr. McCoy liable for the breaches, torts, debts and obligations of McCoy Excavation, including joint liability for the claims asserted by Petra in this action. Mr. McCoy should not be able to benefit from the fraudulent misappropriations, thefts, breaches, and conversion described above by hiding behind a corporate shield that is nothing more than a sham.

68. Upon information and belief, McCoy knew he and McCoy Excavation were not qualified to perform the work required under the Subcontract, or knew he did not know whether he was qualified to perform the Project, and negligently and/or fraudulently misrepresented his qualifications to Plaintiff.

69. On February 22, 2022, Petra filed a Demand for Arbitration with the American Arbitration Association against McCoy Excavation and Christian Mark McCoy, individually (the "AAA Arbitration"). A true and correct copy of the Demand for Arbitration is attached as Exhibit 6.

70. In the Demand for Arbitration, Petra asserted the following causes of action and claims for relief:

a. Breach of Contract, against McCoy Excavation, LLC and against McCoy Individually and/or as the Alter-Ego of McCoy Excavation

b. Breach of Implied Covenant of Good Faith and Fair Dealing, Against McCoy Excavation, LLC and Against McCoy Individually and/or as the Alter- Ego of McCoy Excavation.

c. Fraud, against McCoy Excavation, LLC and Against McCoy Individually and/or as the Alter- Ego of McCoy Excavation)

d. Plaintiffs reasonably relied upon Constructive Fraud, against McCoy Excavation, LLC and Against McCoy Individually and/or as the Alter- Ego of McCoy Excavation.

e. Conversion, against McCoy Excavation, LLC and Christian McCoy Individually and/or as the Alter-Ego of McCoy Excavation.

f. Unjust Enrichment, against McCoy Excavation, LLC and Christian McCoy Individually and/or as the Alter- Ego of McCoy Excavation.

71. On August 10, 2023, a Final Award of the Arbitrator was issued in connection with the AAA Arbitration. A true and correct copy of the Final Award is attached as Exhibit 7.

72. In the Final Award, Petra was awarded $511,302.47 in damages, jointly and severally, against McCoy individually and McCoy Excavation.

73. In the Final Award, the Arbitrator made the following findings and conclusions based on the evidence presented in the Arbitration:

a. that "the evidence further supports the conclusion that [McCoy and McCoy Excavation] wrongfully elicited and wrongfully converted and retained payment of substantial funds on representations that the funds were needed for and were to be directed to the payment of piping materials and services, which Respondents failed to provide. Exhibit 7, p.2.

b. "That Petra suffered damages exceeding $265,135.65 from Respondents' tortious actions, including fraudulent inducement of payments received for, but not used to purchase piping material (Petra's Claim 3), constructive fraud (Petra's Claim 4) as an alternative to fraud, and conversion (Petra's Claim 5)."

c. That, in addition to the damages calculated for Respondents' conversion of trust funds on Petra's Claim 5, Petra is also entitled to recover pre-judgment interest in the amount of $52,765.63 on the $265,135.65 wrongfully retained by Respondents, plus $56,406.28 in attorneys' fees and costs to date, for compensable time and expenses to recover such converted funds.

74. On September 19, 2023, Petra filed its Petition to Confirm Arbitration Award and Brief in Support.

75. On November 29, 2023, the Montana Eighteenth Judicial District Court issued its Order Confirming Arbitration Award. In its Order Confirming Arbitration Award. A true and correct copy of the Order is attached as Exhibit 8.

76. Judgment was entered and filed in the Clerk's office of the Eighteenth Judicial District Court, Gallatin County, and the said Judgment was docketed on November 30, 2023 in the Clerk's office of the Eighteen Judicial District Court, Gallatin County.

## <u>First Cause of Action</u>

**(Denial of Discharge of Debt – 11 U.S.C. § 523(a)(2)(A))**

77. All prior and subsequent allegations are incorporated as if set forth herein in full.

78. Debtor made false representations regarding his qualifications to perform the Project and comply with the terms of the Subcontract to gain Plaintiffs' trust and induce Plaintiffs into executing the Subcontract and advancing substantial funds into trust with Debtor to procure piping materials for the Project.

79. Plaintiffs reasonably relied on Debtor's representations regarding his skill and experience as a qualified contractor and representations that funds advanced by Petra would be used to procure the piping on the Project.

80. Debtor was unable to perform the Subcontract, failed to procure or deliver piping materials to the Project, and failed to complete the Project.

81. As a result of Debtor's false pretenses and false representations, Plaintiffs were damaged in an amount to be proven at trial.

82. Discharge of Plaintiffs' claims against Debtor should be denied pursuant to 11 U.S.C. § 523(a)(2) based on Debtor's having committing acts proscribed by 11 U.S.C. § 523(a)(2)(A).

## <u>SECOND CAUSE OF ACTION</u>

**(Denial of Discharge of Debt – 11 U.S.C. § 523(a)(4))**

83. All prior and subsequent allegations are incorporated as if set forth herein in full.

84. Debtor, through his ownership and exclusive control over McCoy Excavation, became Plaintiffs' fiduciary upon Plaintiffs' advancement of funds into trust with McCoy Excavation.

85. McCoy Excavation's receipt of the advancement of costs to procure piping materials for the Project created a statutory trust pursuant to § 28-2-211, Montana Code. Debtor had a corresponding duty to safeguard and account for those funds for Plaintiffs' benefit.

86. Debtor has failed to properly account for the use of Plaintiffs' trust funds, or to refund the credit balance to Debtor.

87. Debtor's failure to account for proper disposition of statutory trust funds constitutes a breach of fiduciary duty.

88. The conduct of Debtor constitutes defalcation while acting in a fiduciary capacity.

89. Alternatively, if the evidence at trial proves that Debtor intended to convert the trust funds at the time he accepted their deposit, Debtor committed larceny.

90. Therefore, discharge of Plaintiffs' claims against Debtor should be denied pursuant to 11 U.S.C. § 523(a)(4) based on Debtor's having committing acts proscribed by 11 U.S.C. § 523(a)(4).


2:25-ap-02008-BPH Doc#: 1 Filed: 08/05/25 Page 14 of 105

## <u>THIRD CAUSE OF ACTION</u>

**(Denial of Discharge of Debt – 11 U.S.C. § 523(a)(6))**

91. All prior and subsequent allegations are incorporated as if set forth herein in full.

92. Debtor received and accepted Plaintiffs' advanced deposits of funds into trust on behalf of McCoy Excavation.

93. Debtor, through his ownership and exclusive control over McCoy Excavation, became Plaintiffs' fiduciary upon Plaintiffs' deposit of such advanced funds into trust.

94. Debtor knowingly exercised control over Plaintiffs' deposit funds.

95. Upon information and belief, Debtor, without authorization from Plaintiffs, knowingly misapplied, converted, or otherwise permanently deprived Plaintiffs of the benefit of their deposit funds.

96. As a result of Debtor's theft, Plaintiffs were damaged in an amount to be proven at trial.

97. Discharge of Plaintiffs' claims against Debtor should be denied pursuant to 11 U.S.C. § 523(a)(6) based on Debtor having committing acts proscribed by 11 U.S.C. § 523(a)(6).

WHEREFORE, Plaintiff respectfully request an order denying discharge of Plaintiff's claims against Debtor and finding that Debtor obtained the advanced trust funds at issue by false pretenses or false representations; further finding that Debtor acted in a fiduciary capacity when he received and accepted such funds into statutory trust and subsequently breached that fiduciary

duty through his defalcation; and, finally, finding that Debtor committed theft of no less than $265,135.65 plus pre-judgment interest in the amount of $52,765.63 on the $265,135.65 wrongfully retained by McCoy, plus $56,406.28 in attorneys' fees and costs to date, for compensable time and expenses to recover such converted funds, and therefore willfully and maliciously injured Plaintiff in the amount of such theft. Plaintiff further prays for such additional relief as the Court may find to be just and equitable, including post-judgment interest on the amounts awarded in the Final Award, attorneys' fees and costs.

Respectfully submitted this 5th day of August, 2025.

<u>/s/ Edward J. Guza</u>
Edward J. Guza

# STANDARD SUBCONTRACT FORM

Subcontract No. 11-210026-312000

**Project:** **Bozeman West Apartments, 2235 Tschache Lane, Bozeman, MT 59718 ("Project")**

**Owner:** **Bozeman West Apartments, LP, 101 E. Front Street, Suite #304, Missoula, MT 59802 ("Owner")**

**Architect:** **Van Bryan Studio Architects, 21 W. Babcock Street, Bozeman, MT 59715 ("Architect")**

**THIS AGREEMENT ("SUBCONTRACT") WAS PREPARED TO FAIRLY ALLOCATE RESPONSIBILITIES, RISKS AND EXPENSES ARISING OUT OF THE PERFORMANCE OF THIS WORK, AND IS MADE AND ENTERED INTO BY AND BETWEEN:**

**Contractor:** **Petra Incorporated, A Corporation of Idaho ("Contractor")**
**Address:** **1097 N. Rosario Street, Suite #200, Meridian, ID 83642**

**Telephone:** **208-323-4500**

**Subcontractor:** **McCoy Excavation, LLC. ("Subcontractor")**
**Address:** **190 Rock Road, Unit C, Belgrade, MT 59714**

**Telephone:** **316-759-9364**

Contractor, for full, complete, and faithful performance of this Subcontract, agrees to pay Subcontractor ("Contract Sum"):

(a) Lump Sum in the amount of: **Two Million, Forty-Seven Thousand, Seven Hundred Twenty and No/100 Dollars ($2,047,720.00)**

~~(b) Unit Prices as set forth on the attached Unit Price Addendum which on the basis of Owner's estimated quantities will yield a gross contract price of approximately:~~

______________________________ ~~Dollars ($__________).~~

In consideration therefor, Subcontractor agrees as follows:

1. **Scope of Work:** The Subcontractor shall furnish and perform all labor, materials, tools, supplies, equipment, services, facilities, and supervision necessary for the complete and proper performance of the following portions of work ("Work"):

See Exhibit A (Scope of Work)

(Insert and list above a precise description of the Work covered by this Subcontract, referring to the numbers of drawings and pages and/or sections of specifications including any applicable addenda and/or alternates, etc.)

2. **Contract Documents:** The Contract Documents for this Subcontract consist of (1) this Subcontract, including the Subcontract General Conditions and any and all exhibits or addenda attached hereto; (2) the contract agreement dated ***05/13/21***, between Owner and Contractor; the terms and conditions (including the supplementary, and any special and/or other conditions, the specifications, drawings and any addenda) ("Main Contract") and; (3) if applicable, any contract (including general and special conditions of contract) between Contractor and any entity in privity with Contractor for which Contractor performs work or assumes duties or obligations on the Project; and

(4) **Other Contract Documents** include the following:
N/A
All of which documents are in their entirety hereinafter referred to as the "Contract Documents." (N/A).

**Assumption of Main Contract:** Subcontractor agrees to perform its Work in strict accordance with the Contract Documents including, but not limited to all terms and conditions of the Main Contract, which is hereby incorporated by reference. Subcontractor and its lower tier subcontractors ("Lower Tier Subcontractors") acknowledge and agree that they have reviewed the terms, conditions, and procedures of the Main Contract and agree to be bound to and strictly comply with such terms, conditions, and procedures of the Main Contract and agree to be bound to and strictly comply with such terms, conditions and procedures insofar as they relate in any way, directly, or indirectly, to the Work, including but not limited provisions in the Main Contract governing insurance, payment, Change Orders, claim notice and presentation, and dispute resolution. Subcontractor agrees to incorporate the Contract Documents and Main Contract by reference into all agreements with Lower Tier Subcontractors.

3. Under provisions of Article 17 herein, a bond ~~(is)~~ (is not) required in this Subcontract.

4. Under provisions of Articles 18 & 19 herein, the amount of insurance required for this Subcontract is:

Type of Coverage: Workers' Compensation and Employers Liability

Policy Limits: Employer Liability Insurance limits of at least $1,000,000 each accident for bodily injury by accident and $1,000,000 each employee for injury by disease or meet the statutory requirements of the state in which the work is being performed, whichever is greater.

Type of Coverage: Minimum Required Insurance Limits (coverage on an occurrence basis) Commercial General Liability (CG 00 01 1093) or substitute form providing equivalent coverage and shall coverage liability arising from premises, operations, independent contractors, products-completed operations and personal and advertising injury.

Policy Limits:

General Aggregate: $2,000,000
Products/Completed Operations: $2,000,000
Personal Injury Liability: $1,000,000
Each Occurrence Limit: $1,000,000
Per Project General Aggregate: $2,000,000

Type of Insurance: Comprehensive Automobile Liability Insurance for all owned, non-owned, and hired vehicles

Policy Limits: Single combined limits of not less than $1,000,000 per accident (combined bodily injury and property damage liability)

Type of Insurance: Subcontractor Excess Liability (Umbrella)

Policy Limits:

| **$1,000,000** | **$2,000,000** | **$3,000,000** |
|---|---|---|
| Carpet & Flooring Contractors<br>Painters<br>Exterminator<br>Glass Contractors<br>Display Sign & Display Set-up Contractors<br>Plumber<br>Landscaper<br>Hood Vent Cleaner<br>Moving Companies<br>Cleaning Contractors<br>Mechanical Contractors<br>Carpenters<br>Gate/Door Contractors<br>Security Equipment Installers<br>Security Contractors | Elevator/Escalator Contractors<br>Window Cleaning<br>All Trades Using Scaffolding<br>General Contractors for Tenant Improvements<br>Roofing/Skylight Contractors<br>Electrical Contractors<br>Concrete Contractors<br>Sheetrock and Framing Contractors | Structural Steel Contractors |

**IN WITNESS WHEREOF,** CONTRACTOR and SUBCONTRACTOR have executed this Subcontract, and specifically acknowledge that the terms of Article V. Indemnification have been separately negotiated and agreed to, effective the date of the last authorized signature unless otherwise agreed.

PETRA INCORPORATED, A CORPORATION OF IDAHO

By: [signature]
CONTRACTOR (Authorized Signature)

Its: Project Manager

158516
Montana Registration #

7/13/21
Date

Melon Excavation, LLC
SUBCONTRACTOR (Company Name)

By: [signature]
SUBCONTRACTOR (Authorized Signature)

Its: Christian Melon - Owner

248984
Montana Registration #

83-4076375
Federal Tax I.D. Number

13410375688
Workers' Compensation Account I.D. Number

207-1825
Unemployment Insurance Reference Number

7/13/2021
Date

## Article Index


Article 1 – Obligations, Responsibilities and Notice
Article 2 – Drawings
Article 3 – Scheduling
Article 4 – Payments
Article 5 – Change Orders
Article 6 – Nature of Work
Article 7 – Subcontractor Employer
Article 8 – Permits & Taxes
Article 9 – Materials
Article 10 – Submittals
Article 11 – Takeover
Article 12 – Unit Price
Article 13 – Quality / Warranty
Article 14 – Job Damage / Protection of the Work
Article 15 – Safety
Article 16 – Performance
Article 17 – Bond
Article 18 – Worker's Compensation
Article 19 – Insurance
Article 20 – Lower Tier Subcontractors
Article 21 – Modifications
Article 22 – Disputes
Article 23 – Indemnification
Article 24 – Miscellaneous
Article 25 – Special Provisions


| **Exhibits** | **Used** | **Not Used** |
|---|---|---|
| Exhibit A: Scope of Work, Terms & Conditions | X | ☐ |
| Exhibit B: Plans, Specifications & Amendments List | X | ☐ |
| Exhibit C-1: Project Safety Policy | X | ☐ |
| Exhibit C-2: Project Punch List Protocol | X | ☐ |
| Exhibit D: Subcontractor Supplier List | X | ☐ |
| Exhibit E-1: Interim Lien/Claim Waiver | X | ☐ |
| Exhibit E-2: Final Lien/Claim Release | X | ☐ |
| Exhibit F: Subcontractor Prequalification Packet | X | ☐ |
| Exhibit G: Subcontractor Responsibility Requirements | ☐ | X |
| Exhibit H: Indemnification Addendum | X | ☐ |
| Exhibit I: State Specific Addendum | X | ☐ |

## Subcontract Articles

**Article 1 – Obligations Responsibilities and Notice**

1.1 This Subcontract[1] shall be considered to have been made in and shall be interpreted under the laws of the state of the Project.

1.2 Subcontractor acknowledges that prior to executing this Subcontract it has had the opportunity to review the Main Contract and has satisfied itself as to the requirements set forth in such Main Contract to the extent the same refers, relates, or applies to the Subcontractor's Work. It is agreed that Subcontractor shall assume toward Contractor all obligations and responsibilities which Contractor has assumed toward the Owner under the Main Contract. In case of conflict between the terms of this Subcontract and the Main Contract, this Subcontract shall control. The terms of this Subcontract take precedence over the terms of any bid, estimate, proposal or any other document provided by Subcontractor to Contractor regardless of whether such bid, estimate, proposal or other document is incorporated by reference into this Subcontract. Subcontractor shall designate in writing all Lower Tier Subcontractors to Contractor and shall not subsequently change Lower-Tier subcontractors without Contractor's written approval.

1.3 Subcontractor shall provide written notice to Contractor within three (3) days, or within sufficient time to allow Contractor to give notice to Owner pursuant to the terms of the Main Contract (whichever is sooner), after occurrence of any instance of interruption, extra work, additional work, delay, hindrance and/or efficiency loss of any nature whatsoever in Subcontractor's Work, believed by Subcontractor to be caused by the acts or omissions of Contractor, other subcontractors, Owner, Architect/Engineer or the employees or agents of any of them, or by any other third-party or unforeseeable event that is not within Subcontractor's control. In the event Subcontractor believes it is entitled to receive compensation and/or is entitled to an extension of time, due to such an occurrence(s), Subcontractor's shall provide Contractor a Statement of Claim (setting forth in detail the factual and contractual entitlement and basis for Subcontractor's claim with supporting data and critical path schedule analyses to support an extension of time or additional compensation), which shall be delivered to Contractor within fifteen (15) days of the Impact Notice, or within sufficient time to allow Contractor to submit Subcontractor's Statement of Claim to Owner (whichever is sooner), to meet any applicable Main Contract requirements. **FAILURE OF SUBCONTRACTOR TO PROVIDE TIMELY WRITTEN NOTICE, AS PROVIDED IN THIS PARAGRAPH, AND/OR FAILURE BY SUBCONTRACTOR TO TIMELY PROVIDE ITS STATEMENT OF CLAIM FOR AN INCREASE IN THE SUBCONTRACT AMOUNT, OR FOR AN EXTENSION OF TIME SHALL RESULT IN A WAIVER OF SUBCONTRACTOR'S CLAIM.**

Contractor does not waive the requirement for timely written notice and/or timely written submission of the Statement of Claim unless Contractor's waiver is unequivocal, explicit, and in writing and Subcontractor shall not rely on any verbal directive or instruction from Contractor or Owner that would excuse strict compliance with the written notice requirements in the above Section 1.3.

[1] All capitalized terms shall have the same meaning throughout these Subcontract Articles as defined in the Subcontract.

To the fullest extent permitted by applicable law, Subcontractor acknowledges and agrees that it shall not be entitled to damages of any type due to delays and agrees that its sole and exclusive remedy for any delay shall be an extension of time; provided, however, if Contractor recovers delay damages from Owner under the Main Contract on Subcontractor's behalf. Subcontractor may be entitled to an equitable adjustment to the Subcontract price at Contractor's sole and exclusive discretion.

1.4 **Supervision.** The Subcontractor shall supervise and be at the site at all times during the progress of Subcontractor's Work, including any Lower-Tier Subcontractor's Work, and shall not be absent without prior notice to and written consent by the Contractor.

1.5 **Coordination Meetings.** Subcontractor shall attend and participate in Contractor's coordination meetings including, but not limited to, those that may be required for scheduling, safety, quality control, Building Information Modeling and commissioning.

1.6 **Electronic Document Coordination.** Subcontractor and its Lower Tier Subcontractors shall utilize Contractor's electronic project management system to generate and distribute critical project information including RFI's, submittals, Change Orders, and other documents as determined by Contractor. Subcontractor shall comply with Contractor's Electronic Transfer Agreement and applicable policies regarding the sharing and protection of electronic data related to the Project.

**Article 2 - Drawings**

2.1 Subcontractor agrees to furnish drawings, specifications, final selections of materials and other specified items in a timely fashion and in the quantity required by the Main Contract for approval by Owner or Owner's agent, and Contractor, so as not to delay progress of the Work.

2.2 Subcontractor shall furnish all samples, brochures, shop drawings, color charts, schedules, descriptive literature, as-built drawings, data and other submittals required for submission within ample time to allow for Contractor to review and to prevent any delay due to lack of approval. Subcontractor shall submit any such submittals as required by the Scope of Work, Terms & Conditions of Exhibit A as incorporated herein. Subcontractor shall furnish all copies of approved and corrected submittals required for distribution. As part of Subcontractor's Work, Subcontractor shall thoroughly review the submittals of its own vendors and Lower Tier Subcontractors. All such submittals shall be approved by Subcontractor prior to transmittal to Contractor, and Contractor shall have the right to rely upon Subcontractor's approval as constituting compliance with the Contract Documents. Approval by the Project Architect or engineer of any submittals furnished by Subcontractor does not relieve Subcontractor of responsibility for compliance with all requirements of the Main Contract and this Subcontract.

**Article 3 – Scheduling**

3.1 Time is of the essence for Subcontractor's Work. Subcontractor shall complete all Work as required to meet any milestone date set forth in the Contract Documents and in Contractor's Project Schedule ("Project Schedule"). Contractor reserves the right to modify the Project Schedule and Subcontractor will perform in accordance with such modified schedule. Contractor shall give Subcontractor 48-hour advance written notice of anticipated starting dates for the Work. Subcontractor shall start Work on the date named by Contractor and shall complete the several portions and the whole of the Work herein described at such times as will enable Contractor to timely comply with the Main Contract. Subcontractor shall cooperate with Contractor and other subcontractors. Subcontractor will be bound by any provisions in the Main Contract for liquidated damages and, if liquidated damages are assessed against Contractor by Owner, shall pay such damages to the extent caused by Subcontractor. The preceding language shall not be construed to limit or deprive Contractor of any right to recover separate or additional actual and consequential damages for delay to the extent caused by Subcontractor, and Contractor expressly reserves all rights to recover such damages under this Subcontract, applicable law, and in equity.

3.2 Should Subcontractor fail in any respect to prosecute the Work with promptness and diligence and in such manner so as not to delay Contractor or the progress of the Project, or if the progress of the Work is such that in the Contractor's sole opinion the completion of the Work or any part thereof within the Project Schedule is doubtful and Contractor gives Subcontractor written notice thereof, Subcontractor agrees to take all action necessary to recover from the delay to ensure the completion of the Work or any part thereof within the time specified in the Project Schedule, including but not limited to any or all of the following: increase construction manpower in critical quantities and crafts; increase the number of working hours per shift; increase the number of shifts per working day; increase the number of working days per week; increase the amount of construction equipment; or, perform any combination of the foregoing actions. Subcontractor agrees that it shall have no claim for any adjustment in the Subcontract price, or extension of time, or reimbursement because of extra expenses occasioned by compliance with this Section 3.2. Compliance with this Section 3.2 shall not release or relieve Subcontractor from any other obligation or liability assumed under this Subcontract or imposed by applicable laws.

3.3 Should Subcontractor, or any Lower-Tier Subcontractor fail to meet any milestone date set forth in the Contract Documents and in the Project Schedule, and they fail to take necessary action as described in 3.1 within 24 hours, Contractor can supplement the Subcontractor's construction workforce, construction equipment or any combination thereof to ensure the completion of the Work or any part thereof within the time specified, at the sole expense of the Subcontractor. Subcontractor agrees that it shall have no claim for any adjustment in the Subcontract price or extension of time, or reimbursement because of extra expenses occasioned by compliance with this Section or the Subcontract.

3.4 Contractor shall have the right, but not the obligation, to decide the time, order and priority in which the various portions of the Project shall be performed. Subcontractor agrees to take all action necessary to ensure the completion of the Work within the Project Schedule.

3.5 Subcontractor shall: (a) cooperate with Contractor and all others whose work may interfere with Subcontractor's Work; (b) specifically note and immediately advise Contractor in writing of any such interference with Subcontractor's Work; and (c) participate in the preparation of coordination drawings and work schedules in areas of congestion.

3.6 Should the progress of the Work or the Project be delayed by any act or omission of Subcontractor, any Lower-Tier Subcontractor, or any of their respective officers, agents, employees, subcontractors, or suppliers Subcontractor shall be liable to Contractor for any additional costs, expenses and damages incurred by Contractor or Owner.

**Article 4 - Payments**

4.1 **Schedule of Values.** Subcontractor shall submit in writing to Contractor a complete, detailed and accurate schedule of values ("Schedule of Values") of the various parts of the Work, aggregating the total sum of this Subcontract, itemized and detailed as required by Contractor and supported by such evidence as to its completeness and correctness as Contractor may require. The Schedule of Values, when approved by Contractor, shall be used as the basis for making payments hereunder unless it is found to be in error or in conflict with the procedures or determinations of Owner regarding progress payments to Contractor. This requirement to submit a Schedule of Values to Contractor shall be in addition to any submittals required by the Contract or Owner.

4.2 To the extent permitted by applicable law, it is agreed that as a condition precedent to any payment obligation by Contractor to Subcontractor hereunder the Contractor must first receive a corresponding payment from the Owner for the Work of Subcontractor for which payment is sought. Subcontractor specifically agrees that it is relying upon the Owner's credit (not the Contractor's) for payment, and Subcontractor specifically accepts the risk of nonpayment by the Owner.

4.3 Subcontractor shall submit to Contractor applications for payment at such times as will enable Contractor to timely apply for payment from Owner in compliance with the time allowed pursuant to the Main Contract. Unless otherwise mutually agreed, Contractor shall withhold the same percentage retainage from Subcontractor as Owner retains from Contractor under the Main Contract, or as permitted by law. Contractor's obligation to release retainage to Subcontractor shall be subject to proof that there is no defective or non-conforming Work and no unpaid claims which would provide the basis of a lien against the Work or any such retainage or payment bonds. Subcontractor shall be paid pursuant to the Schedule of Values and for accepted Work as of the date of Contractor's last progress billing date and to the extent the Subcontractor's Work has been accepted, approved and paid for by the Owner. Contractor will forward Subcontractor's payment within ten (10) calendar days of receiving the same from the Owner. No progress payment to Subcontractor shall operate as approval and acceptance of work done or materials furnished under this Subcontract.

4.4 To the extent permitted by applicable law, it is agreed that as a condition precedent to any final payment by Contractor to Subcontractor, and upon complete performance of this Subcontract by Subcontractor and final approval and acceptance of Subcontractor's Work and materials by Owner, Contractor will make final payment to Subcontractor of the balance due under the Subcontract within ten (10) days after Contractor has received final or complete payment for Subcontractor's Work and materials have been received by Contractor from Owner. When required by Contractor, and as a condition precedent to any payment, Subcontract shall provide in a form satisfactory to Contractor partial lien releases, claim waivers and affidavits of payment from Subcontractor, and its Lower Tier Subcontractors and suppliers of any tier, in the form provided at Exhibit E, for the completed portion of Subcontractor's Work.

1. Conditioned on and prior to final payment, subcontractor MUST submit to Contractor three (3) sets of complete close-out documentation (except for final certifications) upon 90% completion of contract value. Close-out documentation, when applicable, shall include the following:

   a. all warranties
   b. as-built drawings
   c. as-built BIM files
   d. operation and maintenance data
   e. owner in-service training
   f. test and balance reports
   g. certifications
   h. attic stock
   i. etc., as required by the Project specifications

4.5 If the Main Contract permits payment for materials delivered to the jobsite or to satisfactory storage facilities, with appropriate documentation and insurance, Subcontractor may invoice for materials so delivered and receive payment as outlined above; provided, however, that such stored materials shall be at the risk of Subcontractor until the same are incorporated into the Project. Subcontractor acknowledges that all payments accepted by it or which are otherwise due under this Subcontract shall be held in trust in favor of its laborers, materialmen, governmental authorities, and all others who are legally entitled to: (1) payment pursuant to this Subcontract; or (2) otherwise file a claim against any retainage or payment bond. Subcontractor shall pay its own Lower Tier Subcontractors and suppliers all sums owed them within ten (10) days of receipt of payment from or on behalf of Contractor.

4.6 Progress payments shall be deemed advances and are subject to adjustment at any time prior to final payment for errors, overpayment or Contractor's good faith determination that the remaining balance of payment may be insufficient to insure satisfactory completion of Work covered by this Subcontract or to pay lien, retainage, or bond claims. If Contractor determines in good faith that Subcontractor is obligated to Contractor or anyone else for labor, fringe benefits, taxes, supplies, materials, equipment rental or other proper charges against the Work covered by this Subcontract, the amount of such obligation may be deducted by Contractor from any

payment or payments, including retainage, made under this Subcontract. Contractor shall have the right to retain out of any payments due or to become due to Subcontractor an amount sufficient to completely protect Contractor from any and all loss, damage or expense therefrom, including attorney fees, until said assertion and/or claim has been remedied or adjusted to Contractor's satisfaction by Subcontractor. Provided further that Contractor may from time to time require, and Subcontractor shall promptly provide within three (3) days after written demand, a statement in writing, including supporting documents setting forth what amounts, if any, are due or payable by Subcontractor to third-parties for labor, fringe benefits, taxes, supplies, materials, equipment, or other proper charges against the Work in connection with, or arising out of the performance of, this Subcontract. In the event such statement with supporting documentation is not provided by Subcontract, Contractor may withhold payment until such statement with supporting documentation is provided. Should Subcontract fail to provide such statement and supporting documentation in a timely manner, Contractor may terminate this Subcontract without further notice. In case of such termination, and in addition to any other rights and remedies Contractor may have, Contractor shall have all rights due as specified in Article 11 of this Subcontract.

4.7 Subcontractor agrees not to subcontract any portion of the performance of this Subcontract without the prior written consent of Contractor. Subcontractor shall require any assignee, who takes an interest in the Subcontract as collateral, to agree that: (1) it shall have no right to payment unless and until all Lower Tier Subcontractors, suppliers, employees, union trust funds and taxing authorities have been paid, and any claims of Contractor have been satisfied; and (2) it will repay to Contractor immediately upon request any amount overpaid. Any assignee taking an assignment of any payment otherwise due under this Subcontract shall be bound to the terms and the limitations regarding payment contained in this Subcontract

If some or all of the Work is performed in Idaho this section is modified by **Exhibit I**.

4.8 In the event Subcontractor is in default under this Subcontract, or in the event of any of portion of Subcontractor's Work is defective or non-conforming, then to the fullest extent permitted by applicable law, Contractor will have the right of offset and retain out of any payments due or to become due to Subcontractor the Project or on any other project Subcontractor is performing services for Contractor, a reasonable amount to protect Contractor from any or all loss, damage or expense including attorneys' fees until the payment failure claim, default, suspension, termination for cause or lien has been satisfied by Subcontractor.

**Article 5 – Change Orders**

5.1 Contractor, the Owner, and Owner's Architect may, without invalidating this Subcontract, order changes in: (1) the work within the general scope of the Subcontract, including additions, deletions, or other revisions; (2) the Contract Sum; and (3) the Project Schedule. Subcontractor shall be granted additional compensation and/or time only upon the terms, conditions, and procedures of this Subcontract and only by written acceptance of such Work ("Change Order"). Any additional work and services performed by Subcontractor prior to execution of a written Change Order shall be at Subcontractor's risk.

5.2 In the event the Owner, or the Owner's Architect, orders changes in the Work and requires that such work be performed on an immediate or emergency basis, allowing insufficient time for the proposal procedures set forth in Article 5.3 below to be completed prior to performance of the work, Contractor shall notify Subcontractor that such order for immediate or emergency work has been received from the Owner, or the Owner's Architect, which is within the scope of this Article 5.2, and in such event Subcontract shall accomplish the Work in the time and in the manner so ordered by the Owner or the Owner's Architect. Subcontractor shall, as soon as possible thereafter, and in all events within the time periods required by Article 5.4 below, initiate a Change Request in accordance with the procedures set forth in said Article 5.4.

5.3 Whenever a change in the Work is ordered by Contractor, the Subcontractor shall, within three (3) days, and prior to commencement of such work, submit to Contractor a written cost or credit proposal for such revised work, and a statement of the impact of such change on the Contract Sum and/or Project Schedule ("Change

Request"). Such Change Request shall be accompanied by a complete material and labor breakdown and such other supporting documentation as shall be required by the Main Contract with respect to Change Order(s). Contractor shall, within three (3) days after receipt of the Change Request, estimate the cost or credit of the changes to the Work and any adjustments to the Contract Sum and/or Project Schedule, in a manner consistent with the Main Contract, and shall furnish a copy of such estimate to Subcontractor. If Subcontractor does not provide a written cost or credit proposal, and statement of impact on time for completion, within the three (3) days required by this Article 5, Contractor may, at its election, proceed to determine the cost or credit of the changes to the Work and any adjustments to the Contract Sum and/or Project Schedule, and Subcontractor shall be bound thereby. In all events, Subcontractor shall be required to accomplish the ordered change at the cost, or subject to the credit, and within the time, set forth in Contractor's determination. Subcontractor shall be barred from challenging the Contractor's determination unless it strictly complies with the requirements of this Article 5.3. To the extent that Subcontractor provided a timely Change Request and strictly complied with this Article 5.3, it may challenge the Contractor's determination through the dispute resolution provisions of Article 22 herein. In no event shall the existence of any such disagreement constitute any lawful cause for delay in the performance of the Work.

1. Subcontractor's Mark-up: To the extent that additional work is required of Subcontractor, the total cost for mark-ups to the actual cost of labor and materials forces shall be 15% of the actual direct cost of labor, materials, and equipment, unless otherwise indicated in the Main Contract.

2. All Change Requests, unless expressly waived in writing by Contractor, shall be accompanied by a complete itemization of costs including labor, materials, equipment and tiered-subcontracts, Labor, materials and equipment shall be itemized in the manner prescribed above. Where major cost items are tiered-subcontracts, they shall be itemized also. In no case will a change involving over $500.00 be approved without such itemizations.

5.4 Subcontractor may initiate Change Requests, but no such Change Request shall become effective until approved in writing by Contractor and, if applicable, by the Owner. The parties agree as follows concerning Change Requests initiated by Subcontractor:

1. All Change Requests must be in writing, shall be submitted to Contractor, and shall include a statement of the reason for the Change Request, and the additional cost, or amount of credit to be allowed, and adjustment to the Project Schedule for completion of Subcontractor's Work, by reason of the requested change, together with any other documentation required to be submitted in connection with Change Requests under the terms of the Main Contract.

2. Except in the following circumstances:

   a. where the reason for the Change Request consist of a claim for extras or for compensation or damages by reason of delays or otherwise, based upon events and transactions which occurred prior to a submission of the Change Request by Subcontractor; or

   b. where the reason for the Change Request is immediate or emergency work performed pursuant to an order given under the provisions of Article 5.2.

   Any work done by Subcontractor pursuant to any Change Request, but prior to receipt of all required approvals, shall be at the sole risk of Subcontractor, and in the event all required approvals are not given, Subcontractor shall bear the cost of all work done prior to receipt of required approvals, including, but not limited to, the cost of removal and replacement of any

unapproved work, if such removal and replacement is requested by Contractor or by the Owner.

2. It is mutually agreed that in order to facilitate investigation of claims, and availability of witnesses, and in order to permit maximum opportunity for mitigation of damages in proper cases, Contractor and Owner require that such claims be presented promptly after the event, occurrence, or transaction which gave rise to the claim. Accordingly, it is agreed that no Change Request shall be approved unless submitted in strict compliance with this Article 5. No formal or informal communication or notice, whether written or oral, shall be deemed to constitute a Change Request or shall operate to toll, suspend, or extend the time limitations set forth in this subparagraph.

**FAILURE OF SUBCONTRACTOR TO PROVIDE TIMELY WRITTEN NOTICE IN THE FORM REQUIRED, AS PROVIDED IN THIS ARTICLE, SHALL RESULT IN A WAIVER OF SUBCONTRACTOR'S CLAIM.**

5.5 Subcontractor shall continue to perform the Work, and Contractor shall continue to pay Subcontractor undisputed amounts owed for Subcontractor's Work (subject to Article 4.2 and Contractor's other withholding rights in Article 4), notwithstanding any dispute or disagreement regarding Change Requests, claims, or other disputes, until completion of the Work or completion of the applicable dispute resolution procedures in Article 22.

5.6 Subcontractor acknowledges that, unless expressly stated otherwise within a Change Order, any change in the contract price and time effected through a written change order shall constitute full payment and accord and satisfaction for all costs incurred, labor performed, material and equipment furnished, and any delay, acceleration, loss of efficiency associated with the change in the work.

**Article 6 – Nature of Work**

6.1 Subcontractor has satisfied itself as to the nature and location of the Work, the character, kind and quantity of material to be encountered, the character, kind and quantity of equipment needed, the location, conditions and other matters which can in any manner affect the Work under this Subcontract, and acknowledges that Subcontractor has had a reasonable opportunity to examine the site, all of the Main Contract documents and this Subcontract. Prior to commencing Work, Subcontractor shall examine the site and any surfaces upon which Work is to be performed, and shall notify Contractor in writing of any conditions which might adversely affect its Work; failure to do so will constitute a waiver of entitlement to any additional compensation or contract time arising out of such conditions. This clause shall not be understood to relieve Subcontractor of any additional notice requirements under this Subcontract or the Main Contract.

**Article 7 – Subcontractor Employer**

7.1 Subcontractor has the status of "employer" as defined by the Industrial Insurance, Workers' Compensation, Unemployment Compensation, Social Security, and other similar federal, state, and local statutes. Subcontractor further warrants and acknowledges the following: (a) Subcontractor is customarily engaged in an independently established business of the same nature as the Work performed under this Subcontract; (b) Subcontractor is responsible for filing a schedule of expenses with the IRS for the type of business Subcontractor is conducting; (c) Subcontractor has an account with the Department of Revenue and other appropriate state agencies for the payment of all applicable state taxes; (d) Subcontractor maintains a separate set of books or records that reflect all items of income and expenses of its business.


2:25-ap-02008-BPH Doc#: 1 EXHIBIT 1 Filed: 08/05/25 Page 28 of 105

7.2 Subcontractor shall withhold from its payroll applicable Social Security taxes, Workers' Compensation and Unemployment Compensation contributions, and any other lawfully required withholding and pay the same; Contractor shall be in no way liable as an employer of, or on account of, any employees of Subcontractor. Before final payment is made under this Subcontract, Subcontractor shall furnish Contractor affidavits certifying that it has complied with these laws, rules and regulations. Subcontractor hereby agrees to defend and indemnify Contractor for any and all liability under such laws arising from the Work performed under this Subcontract.

7.3 Verification of Right to Work. It is the Contractor's intention to allow only individuals authorized to work in the United States to provide labor, tools or equipment to the Project. Accordingly, the Subcontractor agrees to ensure that all Subcontractor Work complies with all provisions of all local, state and federal immigration laws, statutes, rules, codes, orders and regulations, including, without limitation, the Immigration Reform and Control Act of 1986, as amended, the Immigration and Nationality Act, as amended, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, and any successor statutes, laws, rules and regulations thereto (collectively, the "Immigration Laws"). Subcontractor agrees to indemnify, defend, and hold harmless any and all Indemnified Parties from any and all liability, including fines, attorneys' fees and court costs, assessed due to noncompliance with the Immigration Laws by Subcontractor or any of its sub-subcontractors. Subcontractor shall, on a bi-annual basis during the term of the Subcontract Documents, conduct an internal I-9 audit of the I-9 Forms for its employees and shall promptly correct any defects or deficiencies which are identified as a result of such audit. Contractor shall be entitled, but has no obligation, to review Subcontractor's bi-annual I-9 audit and/or I-9 forms to evaluate Subcontractor's compliance with such Immigration Laws. Contractor may, in its sole discretion, terminate this Contract immediately if, at any time during the term, Subcontractor violates or is in breach of any provision of this paragraph, such Immigration Laws, or the USCIS determines that Subcontractor has not complied with the Immigration Laws.

**Article 8 – Permits & Taxes**

8.1 Subcontractor shall obtain and pay for all permits, fees, and licenses necessary for the performance of this Subcontract and shall pay any and all federal, state, and local taxes, applicable to the Work to be performed under this Subcontract. Owner or Contractor shall obtain and pay for the initial building permit applicable to the Main Contract.

**Article 9 - Materials**

9.1 Materials delivered by or for Subcontractor and intended to be incorporated into the construction hereunder shall remain on the jobsite and shall become property of Owner upon payment, but Subcontractor may repossess any surplus materials remaining at the completion of the Subcontract except for extra stock required by the Main Contract or this Subcontract. All scaffolding, apparatus, ways, works, machinery, and plants brought upon the premises by Subcontractor shall remain Subcontractor's property. It shall be Subcontractor's responsibility to unload, store, and protect its materials, to bear the risk of loss thereof and to protect such material against loss until actually incorporated into the Work, and until the Work is accepted, even though title thereto may previously have passed to the Owner under the preceding provisions, except that Subcontractor shall not bear that portion of such loss to the extent it arose out of the sole fault of Contractor or its employees. Loss or damage due to acts of Subcontractor shall be deducted from any amounts due or to become due Subcontractor.

9.2 In the event the scope of Subcontractor's Work includes the reliance on the work or installation of materials or equipment furnished by others, Subcontractor shall, make full inspection as to the physical condition and suitability of the work, material, or equipment, and shall immediately notify Contractor in writing of any defect or nonconformity in the same. If Subcontractor fails to provide such written notice within forty-eight (48) hours of discovery of each defect or nonconformity, then Subcontractor shall have accepted the work,



2:25-ap-02008-BPH Doc# 1 EXHIBIT Filed: 08/05/25 Page 29 of 105

materials, or equipment of others as being satisfactory and it shall be fully responsible thereafter for the satisfactory performance of Subcontractor's Work, regardless of the defective work of others.

**Article 10 – Submittals**

10.1 Within one (1) week of being awarded the Subcontract, Subcontractor shall provide a submittal schedule and a list of products requiring the Architect's review or approval which must include the following information:

1. Specification reference;
2. Intended submission date;
3. Required order release date; and
4. Lead times for fabrication and delivery

10.2 Unless otherwise indicated, submittals will be submitted electronically.

10.3 Submittals are required to include the following:

1. Submittal cover sheet indicating the specification reference. Each specification section is to have a separate submittal cover sheet completed or it will be rejected and require resubmittal using the proper format.

2. Corresponding product data for the specification reference with the pertinent data highlighted or indicated.

10.4 Contractor to review submittals for proper information and format. If submittals are not provided in strict accordance with this Article 10, Contractor shall have the right, but not the obligation, to identify the variance and return submittals back to Subcontractor for resubmittal prior to forwarding to Owner or Architect/Engineer. If it is determined by Contractor that the schedule does not permit resubmittal by the Subcontractor the Contractor will make the proper adjustments and may back charge Subcontractor for such service.

10.5 Subcontractor, at its own expense, shall promptly prepare or obtain and submit to Contractor all shop and erection drawings, samples, product data, catalogue cuts, laboratory and inspection reports, engineering calculations, electronically or magnetically stored data, submittals, or other information however described ("Submittals") required by the Contract Documents or as may be necessary or appropriate to describe the details of the Work. All submittals shall be submitted so as to permit the Work to be performed in accordance with the Project Schedule, allowing a reasonable time for review and return of Submittals and, if needed, repeated Submittals.

10.6 Neither review of, nor approval of, Submittals by Contractor, Owner or Architect/Engineer shall relieve Subcontractor of its obligation to perform the Work in strict accordance with the Contract Documents or its responsibility for the proper matching and fit of the Work to contiguous work. Subcontractor shall identify each and every variance between any Submittal and the requirements of the Contract Documents at the time of transmission either prominently on the Submittal or specifically in a transmittal letter accompanying the Submittal. No modification, revision or other notation on a Submittal that changes or modifies the Contract Documents shall be valid (even if the drawing or Submittal is approved) unless there is a Change Order issued approving the modification or revision.

**Article 11 – Takeover**

11.1 **Termination/Suspension by Owner.** In the event Contractor's Work under the Main Contract is terminated, other than for Contractor's default, prior to Project completion, an equitable adjustment to the Contract Sum prior to such termination will be made as provided for in the Main Contract; if no such provision exists, then

by mutual agreement; or, failing either of these methods, by arbitration as provided for in the Article 22. Subcontractor shall be entitled to its expected profits on unperformed Work to the extent Contractor is actually recovers such the same from Owner.

11.2 Contractor may order Subcontractor to suspend Work under this Subcontract. Subcontractor shall not be entitled to any additional compensation or damages for such suspensions, except, and only to the same extent and as a condition precedent to, Contractor receives additional compensation from Owner for Subcontract Work.

11.3 **Termination/Suspension for Convenience.** Upon three (3) calendar day's written notice to Subcontractor, Contractor may terminate this Subcontract in whole or in part for Contractor's convenience. Subcontractor's sole and exclusive remedy for such termination is limited to payment for Work properly performed prior to termination, as determined in Contractor's sole discretion.

11.4 **Termination for Default.** If Subcontractor refuses or fails to supply enough properly-skilled workers or materials to maintain the Project Schedule, refuses or fails to make prompt payment to Lower Tier Subcontractors or suppliers of labor, materials or services, fails to correct, replace, or re-execute faulty or non-conforming Work, disregards the law, ordinances, rules, regulations or orders of any public authority having jurisdiction, files for bankruptcy, or is guilty of a breach of this Subcontract, and fails to correct the default and maintain the corrected condition within not less than forty-eight (48) hours of receipt of written notice of the default, then Contractor, without prejudice to any rights or remedies otherwise available to it, shall have the right to any or all of the following remedies:

1. Supply such numbers of workers and quantity of materials, equipment, and other facilities as Contractor deems necessary for the completion of Subcontractor's Work, or any part thereof, , and to charge the cost thereof to Subcontractor who shall be liable for such damages including reasonable overhead and profit.

2. Perform or contract with one or more additional Lower Tier Subcontractors to perform such part of Subcontractor's Work as Contractor shall determine to provide prompt completion of the Project and charge the cost thereof to Subcontractor.

3. Withhold payment of any monies due or to become due Subcontractor pending corrective action to the extent required and to the satisfaction of Contractor.

4. Terminate this Subcontract, use any materials, implements, equipment, appliances, or tools furnished or belonging to Subcontractor to complete Subcontractor's Work and furnish those materials, equipment, and/or employ such workers as Contractor deems necessary to maintain the orderly progress of the Work. All of the costs, including reasonable overhead, profit, costs, and attorneys' fees, incurred by Contractor in arranging to and performing Subcontractor's Work shall be charged to Subcontractor and Contractor shall have the right to deduct such expenses from monies due or to become due to Subcontractor. Subcontractor shall be liable for the payment of any costs, expenses, or other actual or consequential damages incurred by Contractor that are in excess of the unpaid balance of the Subcontract Price.

In the event of any emergency, Contractor may proceed as above without notice.

### Article 12 – Pricing

12.1 In the event this Subcontract contains unit price items, it is understood and agreed that any quantities mentioned are approximations only and subject to change as required by the Main Contract or as ordered and directed by Contractor.

12.2 All escalation of Subcontractor's costs are to be included for the duration of the Project, including, but not limited to labor, material, equipment, and fuel escalation.

### Article 13 – Quality/ Warranty

13.1 Any non-conforming Work shall, upon notice from Contractor, be immediately removed by Subcontractor. Failure of Contractor to immediately reject any Work or materials shall not in any way waive Contractor's right to object thereto at any time.

13.2 Subcontractor warrants the Subcontractor's Work and materials furnished hereunder to Contractor and Owner on the same terms, and for the same period, as Contractor warrants the Work to Owner under the Main Contract. With respect to Subcontract's Work, Subcontractor shall comply with all warranty obligations and responsibilities of Contractor under the Main Contract. If an element is remedied within the initial warranty period, said warranty period for the affected element will restart to provide a full term warranty for the affected element. All Subcontract warranties shall be in addition to and not in limitation of other warranties or remedies required and/or were arising pursuant to applicable law.

### Article 14 – Job Damage / Protection of the Work

14.1 Contractor shall not be liable or responsible for loss or damage to materials, equipment, tools, facilities, or other property owned, rented, or used by Subcontractor, or anyone for which Subcontractor is responsible; and Subcontractor shall maintain such insurance and take such protective action as it deems necessary to protect Subcontractor for such loss. Except to the extent of any proceeds received by insurance, Subcontractor agrees that Contractor shall not be responsible for any loss or damage to the Work.

14.2 Subcontractor shall take necessary precautions to properly protect Subcontractor's uninstalled Work and the work of others from damage caused by Subcontractor's operations. Should Subcontractor cause damage to the Work or property of others, Subcontractor shall promptly remedy such damage, or Contractor may so remedy and deduct the cost thereof from any amounts due or to become due Subcontractor.

14.3 Job damage caused by Subcontractor, its Lower-Tier Subcontractor or supplier of any tier, to Work other than its own shall be reported immediately to Contractor and Subcontractor shall be responsible for its repair. Job damage caused by Contractor to the Work of Subcontractor shall be reported immediately to Subcontractor and Contractor shall be responsible for its repair.

### Article 15 – Safety

15.1 Subcontractor and its Lower Tier Subcontractors shall take all reasonably necessary safety precautions pertaining to the Work and the Work performance, including compliance with applicable laws, ordinances, regulations and orders issued by a public authority, whether federal, state, local or other, OSHA, and any safety measures requested by Contractor. Subcontractor shall at all times be responsible for providing a safe jobsite and be responsible for the Work performance and safety of all employees, personnel, equipment and materials within Subcontractor's or its Lower Tier Subcontractors' care, custody or control. Subcontractor

and its Lower Tier Subcontractors shall furnish all required safety equipment for Work and ensure all of their employees and Lower Tier Subcontractors' employees have and wear personal protective equipment in compliance with applicable OSHA requirements and Contractor's safety rules, as provided in writing to Subcontractor.

15.2 **Drugs and Alcohol.** The use of illegal drugs or alcohol by any anyone on the jobsite is an intolerable offense. Any such person found in the possession or use of such items will be immediately removed from the jobsite and not allowed to return. The use of prescription medications while on the jobsite shall only be allowed under the direction of a physician, as approved in writing by the Contractor, and when taking the medication causes no impairment or judgement or adverse actions.

15.3 **Cell Phones/Personal Electronics.** Use of cell phones / personal electronic devices is permissible during work hours for company business only. Personal use of cell phones / electronic devices is only permitted during breaks and at lunch time and in designated areas. Before accepting an incoming or making an outgoing call, make sure that such activity will not compromise safety. When operating equipment, driving a vehicle on the jobsite or while performing any jobsite activity that a distraction may cause a potential safety threat, let all incoming calls go unanswered. You then may return the call when you have stopped the equipment, pulled the vehicle to a safe area or put yourself and those are you in a safe environment before returning the call. The following requirements unequivocally apply to the Subcontract Work:

1. Contractor unequivocally prohibits texting and talking on a mobile phone while operating any kind of motorized vehicle on site, including but not limited to, cars, trucks, cranes and heavy machinery. Violating this policy will result in disciplinary action up to and including removal and termination.

2. No music including the use of radios, iPods, MP3s or ear/head phones of any kind.

15.4 Subcontractor certifies that it and its Lower Tier Subcontractors are registered and licensed contractors in the state having jurisdiction over the Work. Subcontractor certifies that it and its Lower Tier Subcontractors maintain a written accident prevention plan and a jobsite-specific safety plan in compliance with applicable laws and OSHA regulations. Subcontractor's Accident Prevention Plan should address subcontractor's role and responsibilities pertaining to safety on the jobsite, training and corrective action and be tailored to safety and health requirements for the Work involved. Subcontractor shall have and enforce a disciplinary action schedule in the event safety violations are discovered. When and as requested by Contractor, Subcontractor shall provide information regarding safety matters.

15.5 Subcontractor shall designate a responsible member of its organization at the site whose duty shall be the prevention of accidents. This person shall be the Subcontractor's superintendent unless otherwise designated by the Subcontractor in writing to the Contractor. This person must be on site whenever Subcontractor has employees working on site and shall remain on site until the completion of Subcontractor's Work.

15.6 Subcontractor shall promptly provide Contractor written notice of safety hazard(s) or violation(s) found on the jobsite or of any injury to its or its Lower Tier Subcontractors' workers incurred on the jobsite.

15.7 Contractor's supervisor may direct Subcontractor's superintendent to remove employees not in compliance with the requirements of this Subcontract. In the event Subcontractor does not promptly correct its safety violation, Contractor may order Subcontractor to stop Work until the violation is corrected, and may correct the violation and charge all costs of compliance to Subcontractor.

15.8 The safety and security of employees and the general public are of vital importance. Therefore, Contractor has a zero tolerance for any violence or threat of violence in the workplace. Violence may include: any physical harm to another person, shoving, pushing, harassment, intimidation, coercion, brandishing weapons,

and threats or talk of violence. Subcontractors shall notify Contractor, immediately in the event of any such actions or events involving their employees.

15.9 Subcontractor agrees to defend, indemnify and hold Contractor harmless from any claims, demands, proceedings, violations, penalties, assessments or fines that arise out of or relate to Subcontractor's failure to comply with any safety-related laws, ordinances, rules, regulations, orders or its obligations hereunder. Contractor may charge against the sums otherwise owing to Subcontractor the amount of the fine and the fees, costs and expenses incurred by Contractor any and all claims arising from or relating to the Subcontractor's Work.

**Article 16 – Performance**

16.1 **Authorized Representatives.** Contractor shall designate one or more persons who shall be Contractor's authorized representative(s): (1) on-site; and (2) off-site. Such authorized representative(s) shall be the only person(s) Subcontractor shall look to for instructions, orders and/or directions, except in an emergency.

16.2 Subcontractor shall designate one or more persons who shall be the authorized Subcontractor's representative(s): (1) on-site; and (2) off-site. Such authorized representative(s) shall: (a) be the only person(s) to whom Contractor shall issue instruction, orders or directions, except in an emergency, (b) be available by cell phone during working hours as well as non-working hours, (c) speak English and be able to converse and direct Subcontractor's personnel, and (d) not be replaced without Contractor's prior approval.

16.3 **Conduct.** Subcontractor shall be responsible for the conduct and performance of its employees, Lower Tier Subcontractors, and anyone Subcontractor brings to the Project. Subcontractor shall immediately remove from the Project any person who is considered, at Contractor's sole discretion, to be incompetent, uncooperative or disposed to be disorderly, or who, for any reason, is not satisfactory to the Contractor, and that person shall not be employed on the Work again.

16.4 **Workmanship.** Every part of Subcontractor's Work shall be executed in strict accordance with the Contract Documents in the most workmanlike manner in accordance with the level of care and skill exercised by such like subcontractors performing similar scopes of work in the same geographic region as the Project. All workmanship shall be as specified, and all materials used in Subcontractor's Work shall be furnished in ample quantities to facilitate the proper and expeditious execution of the Work, and shall be new except such materials as may be expressly provided in the Contract Documents to be otherwise.

16.5 **Housekeeping and Clean Up.** Subcontractor shall DAILY remove all refuse, waste and debris produced by its operation. Refuse shall not be permitted to accumulate to the extent that it interferes with free access to the jobsite or creates a safety hazard. Avoidance of safety hazards through good housekeeping is an important part of Subcontractor's obligations.

16.6 In the event Subcontractor or its Lower-Tier Subcontractor fails to meet these requirements within twenty-four (24) hours after receipt from Contractor of written notice of non-compliance, Contractor may remove refuse and deduct the cost thereof from any amounts due or to become due to Subcontractor. In the event Contractor determines emergency conditions exist, Contractor may proceed as above without prior notice. If Contractor performs cleanup or compliance work involving more than one of its subcontractor's, Contractor's decision on the allocation among subcontractors of the costs incurred by Contractor shall be final and binding on Subcontractor.

16.7 **Hazardous Material.** Subcontractor shall comply with all applicable hazardous waste regulations under federal, state or local laws. Subcontractor shall provide Contractor with all Material Safety Data Sheets for any and all hazardous substances covered under all applicable laws before commencing Work. Subcontractor shall, prior to commencing Work, inform Contractor of its intent to use any hazardous substances at the Project and shall continuously update the Contractor of any new hazardous substance brought to the Project during

performance of the Work. Failure to comply with this paragraph may result in fines and damages being assessed to Subcontractor. Subcontractor shall defend, indemnify and hold Contractor harmless from any and all costs and expenses, including attorneys' fees, arising from the use or discharge of any hazardous substance by Subcontractor at or off the Project site.

16.8 **Substitutions.** No Substitutions shall be made in Subcontractor's Work unless permitted in writing by the Contractor and only then upon Subcontractor first receiving all approvals required under the Contract Documents. Subcontractor shall indemnify Contractor for any increased costs incurred by Contractor as a result of such substitutions.

16.9 **Use of Contractor's Equipment.** Subcontractor, its agents, employees, Lower Tier Subcontractors or suppliers shall not use Contractor's equipment without the express written permission of Contractor's designated representative.

16.10 If Subcontractor or any of its agents, employees, suppliers or Lower Tier Subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items owned, leased, or under the control of Contractor, Subcontractor shall be liable to Contractor for any loss or damage (including personal injury or death) which may arise from such use. In the event the Subcontractor uses an operator supplied by Contractor, Subcontractor agrees that it has exclusive direction, supervision and control over that operator and will be liable for the actions or omissions of such operator.

16.11 **As-Builts.** Subcontractor shall continuously update a set of As-Built drawings as the Work progresses and provide As-Built drawings and operation and maintenance information when the Work is substantially complete. Current As-Built documents are a condition precedent to making any payment to Subcontractor.

**Article 17 – Bond**

17.1 If the Subcontract requires Subcontractor to supply bonds for the Project, then Subcontractor shall, as its own expense, furnish contractor, within ten (10) days of receipt of the execution of this Subcontract, performance and payment surety bonds, acceptable to Contractor and Owner, in an amount equal to the Contract Sum. The bonds shall be conditioned upon the full and faithful performance of all terms, provisions, and conditions of this Subcontract and upon payment for all labor, materials, equipment and supplies used in the prosecution of the Work described herein.

17.2 Contractor may issue checks payable jointly to the Subcontractor and its related suppliers and Lower-Tier Contractors to the extent it deems necessary.

17.3 To the extent required, no payment shall be made to Subcontractor for Work performed pursuant to this Subcontract until the required payment and performance bonds have been delivered to Contractor. Provided, in the event the Subcontractor cannot provide the Contractor with the required payment and performance bonds, Contractor may elect, at its sole discretion, without waiving any rights, to permit the Subcontractor to proceed without bonds for a period of time. If Contractor subsequently elects to insist on bonds, and Subcontractor either refuses to, or cannot provide payment and performance bonds, then Contractor shall have the right to terminate Subcontractor's right to proceed under this Subcontract.

17.4 In the event Subcontractor shall fail to promptly provide the requested bonds, Contractor may terminate this Subcontract and re-let the Work to another subcontractor and all Contractor's costs and expenses incurred above the remaining Contract Sum shall be paid by Subcontractor.

**Article 18 – Workers Compensation**

18.1 Subcontractor shall furnish to Contractor evidence that it has in force workers' compensation insurance including employer's liability, as may be required by the jurisdiction or jurisdictions in which the Work is being performed.

18.2 Where applicable, this shall include United States Longshoremen's and Harbor Workers' Insurance including Coverage B – Employer's Liability (Maritime) with limits not less than the Bodily Injury limits required of the Contractor by the Main Contract, but in no event less than $1,000,000.

**Article 19 – Insurance**

19.1 Subcontractor shall obtain and keep in force during the term of this Subcontract, and during the applicable statute of repose, commercial general liability insurance with dollar limits and coverage equal to, or greater than the types and amounts of coverage noted at the front of this Subcontract. Such insurance shall be "occurrence-based" and shall include contractual liability coverage applicable to the indemnity provisions of this Subcontract and "completed operations" coverage. Subcontractor shall furnish to Contractor evidence of this insurance including the provision regarding notice of cancellation or reduction in coverage. Such evidence of insurance shall be in the form of an insurance certificate issued by an insurer satisfactory to Contractor and shall provide for not less than thirty (30) days prior written notice to Contractor of cancellation or reduction in coverage. In the event Subcontractor fails to maintain any and all insurance required by this Subcontract during the entire life of this Subcontract, Contractor may at its option, and without waiver of other available remedies, purchase such insurance in the name of Subcontractor and deduct the cost of same from payments due Subcontractor.

19.2 Subcontractor's insurance shall: (1) name Contractor and Owner as additional insureds for liability arising out of the Subcontractor's work, including completed operations losses, without qualification, limitation or reservation; (2) be primary and non-contributory with any insurance maintained by Contractor or Owner; (3) not contain a "cross liability" or similar exclusion that would bar coverage for claims between or among insureds; (4) contain a severability of interest provision in favor of Contractor and Owner; and (5) contain a waiver of subrogation against Contractor and Owner. Before commencing work, Subcontractor shall provide a copy of the additional insured endorsement to Contractor as evidence of additional insured status.

19.3 If Builder's risk or any other property insurance is provided, Contractor and Subcontractor waive all rights against each other and Owner, and Lower Tier Subcontractors, agents and employees each of the other, for loss or, damage to the extent covered by Builder's risk or any other property or equipment insurance, except such rights as they may have to the proceeds of such insurance. Subcontractor shall be responsible for that portion of the Builder's risk policy's deductible (or self-insured retention) which is proportionate to the loss or damage resulting from acts or omissions attributable to Subcontractor. Subcontractor shall procure and maintain, at Subcontractor's own expense, property and equipment insurance for portions of the Subcontract Work stored off the site or in transit. Contractor and Owner neither represent nor assume responsibility for the adequacy of the Builder's Risk insurance to protect the interests of Subcontractor. It shall be the obligation of Subcontractor to purchase and maintain any supplementary property insurance that it deems necessary to protect its interest in the Work.

19.4 Contractor makes no representations that the required minimum amount of insurance is adequate to protect Subcontractor. The procuring and/or carrying of insurance shall not limit Subcontractor's obligation or liability pursuant to this Subcontract or as a matter of law.

**Article 20 – Lower-Tier Subcontractors**

20.1 Any Lower Tier Subcontractor shall be bound to Subcontractor to the same extent Subcontractor is bound to Contractor and to the same extent Contractor is bound to Owner pursuant to the Main Contract. This form may be used for Lower Tier Subcontractors and when so used the term "Owner" (in the General Conditions)

shall include any entity in privity with Contractor for which Contractor performs work or assumes duties and/or obligations.

**Article 21 – Modifications**

21.1 No modification to, or waiver of any rights under, this Subcontract shall be valid or binding on the parties to this Subcontract unless the same be in writing. Failure of Contractor to insist upon strict performance of any term or condition of this Subcontract, or to exercise any option herein conferred on one or more instances, shall not be construed to be a waiver of such performance or option, or of any other covenants or agreements, on subsequent occasions, but the same shall be and remain in full force and effect.

**Article 22 – Disputes**

22.1 **Pass-through Claims.** In the event of any dispute or claim between Contractor and Owner which directly or indirectly involves the Work performed or to be performed by Subcontractor, or in the event of any dispute or claim between Contractor and Subcontractor caused by or arising out of conduct for which Owner may be responsible, Subcontractor agrees to be bound to Contractor by the terms of the Main Contract and by any and all procedures and resulting decisions, findings, determinations, judgements or awards made thereunder, or by an administrative agency, board, court of competent jurisdiction or arbitration. Subcontractor agrees to cooperate fully with Contractor and to furnish all documents, statements, witnesses, and other information required by Contractor for such purpose and shall pay or reimburse Contractor for all expenses and costs, including reasonable attorneys' fees incurred in connection therewith, to the extent of Subcontractor's interest in such claim or dispute.

Subcontractor agrees to be bound by the procedure and final determinations as specified in the Main Contract and agrees that it will not take, or will suspend, any other action or actions (including but not limited to any arbitration(s) or action(s) commenced pursuant to the Federal Miller Act, state lien statutes, Bond or Retainage Act(s) with respect to any such claims and will pursue no independent litigation or other formal dispute resolution procedure with respect thereto, pending final determination of any dispute resolution procedure between Owner and Contractor. It is expressly understood and agreed that as to any and all claims asserted by Subcontractor in connection with the Project arising from the actions or fault of Owner, Contractor shall not be liable to Subcontractor for any greater amount than Owner actually pays Contractor, less any markups or costs incurred by Contractor. As to any claims asserted by Subcontractor for or on account of acts or omissions of Owner or its agents or design professionals, at the sole option of Contractor, Subcontractor agrees to prosecute such claims in Contractor's name. For any amount recovered or collected (whether through proceedings or settlement) by Subcontractor, Contractor shall be entitled to 10% of such amount received or collected as its mark-up for such claims. Subcontractor shall have full responsibility for preparation and presentation of such claims and shall bear all expenses thereof including attorneys' fees.

22.2 **Arbitration.** All other claims, disputes, and other matters in question between Contractor and Subcontractor arising out of, or relating to, the Main Contract or this Subcontract, the breach thereof, or Work thereunder (for which a dispute resolution procedure is not otherwise provided in the Main Contract), shall be decided by arbitration at Contractor's sole and exclusive option, otherwise all disputes shall be decided by litigation. If Contractor elects arbitration as the binding dispute resolution procedure and the claims alleged in the dispute are quantified at $1,000,000.00 or below, the same shall be heard by a single arbitrator. To the extent that the damages alleged in the dispute are quantified at more than $1,000,000.01 then the same shall be heard by a panel of three arbiters. The arbitration proceedings will be administered by AAA in Boise, Idaho, with arbitrators appointed from the Construction Industry Panel under the Construction Industry Rules. Any litigation proceedings shall be in Ada County Court, Idaho. Contractor and Subcontractor agree to be bound by any findings and award of such arbitration finally and without recourse to any court of law other than for the enforcement of the arbitrator's decision. As between the parties to this Subcontract, the prevailing party in any arbitration shall be entitled to an award of its attorneys' fees, costs and expert fees incurred. Contactor

and Subcontractor expressly grant the arbitrator the authority to award attorneys' fees and costs. Subcontractor further consents to joinder in any arbitration involving the Contractor and Owner.

22.3 **Mediation.** As a condition precedent to the hearing of any trial or arbitration, the parties to this Subcontract shall submit any and all disputes between them to non-binding mediation with the assistance of an experienced mediator. The parties shall each designate a representative with full settlement authority who will participate hours in the mediation. The parties shall bear equally all expenses, exclusive of attorneys' fees, associated with the mediation.

**Article 23 – Indemnification**

23.1 A mutually negotiated indemnification Addendum ("Indemnification Addendum") is attached hereto and marked as **"Exhibit H,"** and is incorporated as fully as if set forth herein.

23.2 In the event Subcontractor contracts with Lower Tier Subcontractors to perform all or a portion of Work, Subcontractor shall submit to Contractor all required insurance endorsements for each of its Lower Tier Subcontractors.

23.3 Subcontractor's indemnity and defense obligations shall survive the termination and/or completion of all Work and this Subcontract.

**Article 24 - Miscellaneous**

24.1 This Subcontract shall be considered to have been made in and shall be interpreted under the laws of the State where the Work is to occur. Notwithstanding anything to the contrary, the site of any arbitration or venue of any lawsuit arising out of this Subcontract or the Work shall be at Ada County, Idaho.

24.2 Any written notice required to be given to a party shall be hand-delivered or delivered to the address of that party indicated above. Subcontractor shall comply with all federal, state and local laws, regulations and orders prohibiting discrimination on the basis of race, religion, sex or national origin. This Subcontract represents the final understanding of the parties and Contractor assumes no responsibility for any different understanding or any representations made by any of its officers, agents, or others prior to the execution of this Subcontract unless expressly stated herein.

24.3 If either party fails to perform the provisions of this Subcontract, the party at fault agrees to pay all costs incurred to enforce this Subcontract including a reasonable attorneys' fee whether or not arbitration or judicial proceedings are commenced.

24.4 Time is of the essence in this Subcontract.

24.5 In the event that the Contract Sum is greater than or equal to $25,000, Subcontractor shall complete the Subcontractor prequalification packet ("Prequalification Packet"), and submit all documents required therein to Contractor prior to performing Work on the Project. If Subcontractor does not qualify for the Project or Work based on information provided in the Prequalification Packet this Subcontract may be voided. Contractor may withhold payment until a completed Prequalification Packet is provided. Subcontractor's company owner(s), officer(s), director(s), and the individual executing this Subcontract (hereinafter referred to as "Guarantor") hereby personally guarantee to Contractor any and all obligations of the Subcontractor of every kind and character, irrespective of the amount of said obligations. Subcontractor hereby agrees to pay Contractor promptly on demand any sum which may become due to Contractor by the Subcontractor whenever the Subcontractor shall fail to pay the same.

24.6 Subcontractor agrees to comply with all Federal, State or other applicable laws or regulations relating to harassment and discrimination. Subcontractor agrees to indemnify and hold harmless Contractor and Owner from all

costs, expenses (including legal and accounting fees and associated costs), fines, claims, suits, proceedings and other liabilities that Contractor or Owner incurs as a result of Subcontractor's failing to comply herewith.

**Article 25 – Special Provisions**

Exhibit A – (Scope of Work, Terms & Conditions)

Exhibit B – (Plans, Specifications & Amendments)

Exhibit C-1 – Project Safety Manual and Exhibit C-2 – Project Punchlist Protocol

Exhibit D – Subcontractor / Supplier List

Exhibit E-1 & E-2 – Interim Lien/Claim Waiver & Final Lien/Claim Release

Exhibit F – Subcontractor Prequalification Packet

Exhibit G – Subcontractor Responsibility Requirements

Exhibit H – Indemnification Addendum

Exhibit I – Montana Addendum


2:25-ap-02008-BPH Doc# 1 Filed: 08/05/25 Page 39 of 105

# EXHIBIT A
# SCOPE OF WORK, TERMS & CONDITIONS

**SUBCONTRACTOR** shall provide all labor, equipment and materials for all ***Earthwork, Exterior Improvements, Site Concrete, Asphalt Paving, Striping, Signage & Utilities*** as follows:

**SCOPE OF WORK:** Scope of Work shall be performed strictly per such plans and specifications as revised, unless otherwise stated herein.

**McCoy Excavation, LLC.**

Division 01 – As applicable
Division 03 – As applicable
Division 31 – Complete
Addenda 1

General Requirements

- Mobilization
- Potholing
- Submittals
- GPS modeling for excavations
- As-builts for civil improvements per project requirements

Erosion Control

- SWPPP plan and filing
- SWPPP BMPs, including but not limited to:
  - Stabilize construction entrances, roads, and staging areas.
  - Street sweeping as required
  - Site entrance wash rack
  - Inlet and manhole protection
  - Rock bag and fabric berm
  - Stock pile covering
  - Silt fencing
  - Maintenance as required
- Dewatering as required for underground scopes

Demolition

- Clear and grub entire site within the limits of work, as may be phased by the Contractor. Haul off any/all existing material which is not part of the final construction
- Stockpile topsoil onsite per agreed upon location
- Demo existing elements as indicated, including but not limited to, piles, fencing, hardscapes, etc.

- Demo existing utilities, including but not limited to, relocation of existing fire hydrant and removal of existing sewer cleanout
- Sawcut, Removal and replacement of existing asphalt and concrete as required
- Locate existing utilities and provide protection from damage.

Site Excavation

- Site Excavation and fill
- Import / Placement of structural fill for building footings and slab on grade
- Hauling and haul off as needed
- Import and export as required to meet design grades and elevations
- Management of spoils, such as incorporation into design or off-haul

Subgrade prep, aggregate placement, and finish grading

- Preparing all subgrades including, but not limited to, asphalt, concrete SOG, footings, curbs, sidewalks, valley gutters, concrete pads, drive approaches and landscaping
- Drainage and granular base for all areas
- Separation fabric as indicated, such as under all site base course improvements, etc.
- Aggregate base course for all areas indicated, including but not limited to asphalt, concrete SOG, footings, curbs, sidewalks, concrete pads, CIP walls, chamber systems, storage unit stoops, and drive approaches

Storm Sewer System

- Construct all storm drain systems as required
- Includes all piping, fittings, castings, structures, manholes, grates, fixtures, roof drains, curb inlets, field inlets, etc.
- Construct underground detention chamber system, including piping, ports, concrete collars, filter fabric, rock, etc.

Water / Fire Utilities

- Construct all water and fire lines and connect to mains as required – including taps
- Includes all piping, fittings, valves, vaults, pumps, switches, thrust blocking, hydrants, concrete collars, etc.
- Extend fire lines into fire riser room(s) with flange, coordinate riser elevation with fire contractor
- Install irrigation sleeves, coordinate with landscaper

Sanitary Sewer Utilities

- Construct sanitary sewer lines of all types and sizes
- Includes all piping, fittings, structures, manholes, grates, cleanouts

Surface Improvements

- Provide asphalt paving as indicated, including required lifts
- Asphalt sawcutting and patching as required.
- Striping, signage, and street markings.
- Fine gravel trail, includes all prep

Site Concrete

- All site concrete and forming, including curbs, sidewalks, maintenance building slab, ski/bike slab, monument footing, concrete pads, CIP walls, and drive approaches.
- All concrete reinforcement and accessories, including, chairs, ties, joint material, snap cap, ADA warning patterns, etc.
- Install site fixtures (supplied by others) in concrete as indicated, including bollards, bike racks, etc.
- Concrete washouts and maintenance as required.

Alternates accepted and included with the contract scope and sum:

1. Pipe escalation - $47,177.30
    - All pipe increases from original bid.
2. Carport concrete - $49,843.00
    - Supply and install site concrete for carports, including excavation, backfill, subgrade prep, reinforcements.
3. Foundation Insulation - $24,700
    - Supply and install foundation insulation as required

Inclusions:

- All mobilizations
- Layout as required
- All excavation, backfill, compaction and restoration for this scope of work
- Conformance to schedule including phasing / turnover requirements
- All utilities to be brought to within 5' of the building footprints unless specifically noted above. Last trade to the point of connection is responsible for completing said connection
- All measures to put system into use, as applicable, such as testing, inspections, disinfecting, etc.

- Trenching and shoring safety measures as required
- Traffic Control for this scope of work
- Notify Superintendent 48 hours in advance of any truck deliveries
- Notify Superintendent 24 hours in advance of inspections
- Submit RFI's to Superintendent and Project Manager a minimum of 5 working days in advance of possible scope delay
- All craft personnel are required to wear all required PPE's. Work boots, long pants, short or long sleeve shirts, hard hat, high visibility, and safety glasses
- Check-in and out with Petra Superintendent when arriving and departing at the site
- Dust Mitigation for associated work
- Clean up as required on a daily basis

**Total Amount: $2,047,720.00**

1. All materials and installation not meeting the specified standards may be condemned by Owner's Architect.
2. Subcontractor to clean and scrap all of Subcontractor's own work daily.
3. Subcontractor will comply with all applicable laws, including but not limited to OSHA, related to this scope of work.
4. Attendance at weekly Project meetings is required unless directed in writing by Contractor otherwise.

**GENERAL SCOPE NOTES:**

1. Provide all required submittals within ten (10) days of Subcontract award, unless directed by Contactor in writing otherwise, to Contractor for review. Subcontractor shall not manufacture or install any products without Contractor's approval. All products to be supplied and installed as per manufacturer's recommendations and instructions. Should Project conditions or specified requirements conflict with manufacturer's instructions, consult Contractor to resolve conflict.

2. All required insurance coverage shall be obtained and certificates of insurance certifying it to be in force shall be delivered to Contractor **prior** to the commencement of any Subcontract Work.

3. A Letter of Warranty and all required closeout information for the scope of the Subcontract shall be submitted to Contractor **prior to retention being released**.

4. Subcontractor to provide all supervision, labor, materials and equipment for Subcontractor's Work. All Work to be of the highest quality, and acceptable to Contractor, and Owner's Architect(s) and/or Engineer(s). All Work to satisfy requirements of the State of Montana, City of Bozeman, County of Gallatin, and all other applicable code authorities. All applicable code authorities' requirements supersede drawings, notes, and specifications where applicable at no additional expense to Contractor, Owner, or Owner's Architect(s) and/or Engineer(s).

5. Observe all pertinent safety rules. This is a HARD HAT AREA Project. MSDS Sheets and Safety Manuals are required to be on site at Contractor's job site office for the duration of Subcontractor's onsite performance.

**TERMS & CONDITIONS OF PAYMENTS**

Contractor will make every effort to pay Subcontractor on time if the following procedures are observed. The following forms are included in the Payment Package: "Application for Payment", "Conditional Lien Waiver and Release – Progress Payment", "Unconditional Lien Waiver and Release – Final Payment" and "Schedule of Values" (when applicable).

1. The Payment Package must include the name and address of Subcontractor along with the Project name and a clear description of the Work and/or materials furnished.

2. The Payment Package must be submitted to Contractor's office **no later than the 20th of the month**. Payment packages received after the 20th will be delayed thirty (30) days being processed for payment.

3. All non-discount invoices will be paid and mailed by the 10th day following receipt of payment from Owner, subject to the requirement of Article 4 Payments. Subcontractor acknowledges and accepts that payment from the Owner is a condition precedent to Contractor's obligation to pay. Subcontractor specifically agrees that it is relying upon the Owner's credit (not the Contractor's) for payment, and Subcontractor specifically accepts the risk of nonpayment by the Owner.

4. Work not covered by Subcontract must be authorized by a signed Change Order **PRIOR** to submitting an invoice.

5. A signed and notarized Conditional Lien Waiver and Release – Progress Payment must be submitted with each payment application.

6. A signed and notarized Conditional Lien Waiver and Release – Progress Payment from each supplier and Lower Tier Contractor must be submitted with each payment application.

7. Contractor reserves the right, at any time, to make an inquiry to other Lower Tier Contractors, and material suppliers to verify that said Lower Tier Contractors and material suppliers are paid regularly as related to Contractor's Project.

8. The Subcontractor Supplier List is being furnished to Contractor for the express purpose of being able to monitor how the Subcontractor is paying bills to their vendor(s) on this specific Project. If the Subcontractor purchases from any additional vendor(s) not included on the Subcontractor Supplier List, the Subcontractor must notify Contractor immediately in WRITING. **That, for the purpose of said Subcontract, the omission of any suppliers, materials, or Lower Tier Contractors can be construed as deliberate and constitute fraud.**

9. Questions or differences in the accounting between Subcontractor and Contractor should be brought to Contractor's immediate attention. Unresolved differences will only delay payment.

10. Payment Packages for materials back ordered, materials not stored on job site, or for work not yet performed will not be accepted.

11. Retention will be required on all subcontracts. The retention will be held until Owner accepts the building as complete and Contractor receives payment from Owner. Subcontractor acknowledges and accepts that payment from the Owner is a condition precedent to Contractor's obligation to pay. Subcontractor specifically agrees that it is relying upon the Owner's credit (not the Contractor's) for payment, and Subcontractor specifically accepts the risk of nonpayment by the Owner. At the end of the retention period an Application for Payment, a Conditional Lien Waiver and Release – Final Payment from Subcontractor, and an Unconditional Lien Waiver and Release – Final Payment from all Suppliers and Lower Tier Contractors must be submitted to obtain payment of retention. Retention will be released within ten (10) days after Contractor has received final payment from Owner.

12. Certified payroll reports are required to be sent to Contractor, Petra, Inc. a Corporation of Idaho, on a monthly basis. If there is a third-party subcontractor that is contracted with you, your company is responsible to forward their reports to Petra on a monthly basis also. Payments will be held until all required documents are received.



2:25-ap-02008-BPH Doc# 1 Filed: 08/05/25 Page 44 of 105
EXHIBIT 1

13. Petra Incorporated, a Corporation of Idaho looks forward to doing business with your company. If the above procedures are closely observed, Payment Packages will be processed and paid with minimal delays. We thank you for your cooperation.

# EXHIBIT B
# PLANS, SPECIFICATIONS & AMENDMENTS LIST

**PLANS**

| Sheet No. | Description | Date |
|---|---|---|
| T1.0 | Title Sheet Volume 1 of 2 | 03/30/18 |
| T1.1 | Code Review | 03/30/18 |
| T1.2 | Code Review | 03/30/18 |
| T1.3 | General Architectural Specifications | 03/30/18 |
| T1.4 | Accessibility | 03/30/18 |
| T1.5 | Accessibility | 03/30/18 |
| T1.6 | Accessibility | 03/30/18 |
| T1.7 | Code Review IECC Rescheck | 03/30/18 |
| C000 | Cover Sheet | 03/30/18 |
| C010 | General Notes, Legend & Abbreviations | 03/30/18 |
| C015 | Construction Traffic Route Map | 03/30/18 |
| C020 | Erosion & Sediment Control Details | 03/30/18 |
| C030 | Water Details | 03/30/18 |
| C040 | Sanitary Sewer & Storm Drain Details | 03/30/18 |
| C041 | Storm Drain & Site Grading Details | 03/30/18 |
| C042 | Storm Water Infiltration & Storage Details | 03/30/18 |
| C043 | Storm Drain Details | 03/30/18 |
| C050 | Curb, Paving, Approach & Decorative Crosswalk Details | 03/30/18 |
| C052 | Signage & Pavement Marking Details | 03/30/18 |
| C100 | Existing Site Features & Topography | 03/30/18 |
| C200 | Erosion & Sediment Control – Phase 1 - Preconstruction | 03/30/18 |
| C201 | Erosion & Sediment Control – Phase 2 – Site Preparation | 03/30/18 |
| C202 | Erosion & Sediment Control – Phase 3 – Construction | 03/30/18 |
| C300 | Overall Site Utility Plan | 03/30/18 |
| C310 | East Entrance Water Improvements | 03/30/18 |
| C320 | West Drive & Turbulence Lane Water Improvements | 03/30/18 |
| C330 | South Drive Water Improvements | 03/30/18 |
| C340 | Walkway Corridor Water Improvements | 03/30/18 |
| C350 | East Drive Water Improvements | 03/30/18 |
| C370 | Community Building Domestic Water Service | 03/30/18 |
| C371 | Building A-1 Fire Service | 03/30/18 |
| C372 | Building A-2 Fire Service | 03/30/18 |
| C373 | Building A-3 Fire Service | 03/30/18 |
| C374 | Building B-1 Fire Service | 03/30/18 |
| C375 | Building B-2 Fire Service | 03/30/18 |
| C376 | Building B-3 Fire Service | 03/30/18 |
| C430 | South Drive Sewer Improvements | 03/30/18 |
| C440 | Walkway Corridor Sewer Improvements | 03/30/18 |
| C450 | East Drive Sewer Improvements | 03/30/18 |
| C460 | North Drive Sewer Improvements | 03/30/18 |
| C470 | Community Building Sanitary Sewer Service | 03/30/18 |
| C471 | Building A-1 Sanitary Sewer Service | 03/30/18 |
| C472 | Building A-2 Sanitary Sewer Service | 03/30/18 |
| C473 | Building A-3 Sanitary Sewer Service | 03/30/18 |
| C474 | Building B-1 Sanitary Sewer Service | 03/30/18 |
| C475 | Building B-2 Sanitary Sewer Service | 03/30/18 |

| | | |
|---|---|---|
| C476 | Building B-3 Sanitary Sewer Service | 03/30/18 |
| C500 | Overall Site Plan & Dimensions Plan | 03/30/18 |
| C501 | Site Signage & Pavement Markings | 03/30/18 |
| C600 | Overall Site Grading & Drainage Plan | 03/30/18 |
| C601 | Site Grading & Drainage Plan – Northwest | 03/30/18 |
| C602 | Site Grading & Drainage Plan - Southwest | 03/30/18 |
| C603 | Site Grading & Drainage Plan - East | 03/30/18 |
| L1.0 | Landscape Notes & Schedule | 03/30/18 |
| L1.1 | Planting Plan | 03/30/18 |
| L1.2 | Planting Plan | 03/30/18 |
| L1.3 | Planting Plan | 03/30/18 |
| L1.4 | Planting Plan | 03/30/18 |
| L1.5 | Planting Plan | 03/30/18 |
| L1.6 | Planting Plan | 03/30/18 |
| L1.7 | Planting Plan | 03/30/18 |
| L1.8 | Planting Plan | 03/30/18 |
| L1.9 | Planting Plan | 03/30/18 |
| L1.10 | Planting Plan | 03/30/18 |
| L1.11 | Landscape Details | 12/09/20 |
| L1.12 | Landscape Details | 12/09/20 |
| L2.0 | Irrigation Notes & Schedule | 03/30/18 |
| L2.1 | Irrigation Plan | 03/30/18 |
| L2.2 | Irrigation Plan | 03/30/18 |
| L2.3 | Irrigation Plan | 03/30/18 |
| L2.4 | Irrigation Plan | 03/30/18 |
| L2.5 | Irrigation Plan | 03/30/18 |
| L2.6 | Irrigation Plan | 03/30/18 |
| L2.7 | Irrigation Plan | 03/30/18 |
| L2.8 | Irrigation Plan | 03/30/18 |
| L2.9 | Irrigation Plan | 03/30/18 |
| L2.10 | Irrigation Plan | 03/30/18 |
| L2.11 | Irrigation Details | 03/30/18 |
| PH-1 | Storm Water Phasing Plan – Phase 1 | 09/18 |
| A1.0 | Site Plan | 03/30/18 |
| A1.1 | Garbage & Maintenance Buildings | 03/30/18 |
| A1.2 | Enlarged Plans, Storage Building & Site Details | 03/30/18 |
| A2.0 | Main Level Floor Plans & Details Building A | 03/30/18 |
| A2.1 | 2nd/3rd Level Floor Plan Building A | 03/30/18 |
| A2.2 | Main Level Floor Plan Building B | 03/30/18 |
| A2.3 | 2nd/3rd Level Floor Plans Building B | 03/30/18 |
| A3.0 | Finish Schedule & Construction Assemblies | 03/30/18 |
| A4.0 | Door/Window Schedule & Details | 03/30/18 |
| A4.1 | Door Details | 03/30/18 |
| A4.2 | Window Details | 03/30/18 |
| A5.0 | Enlarged Plans – ICC Type B | 03/30/18 |
| A5.1 | Enlarged Plans – ICC Type B | 03/30/18 |
| A5.2 | Enlarged Plans – ICC Type A | 03/30/18 |
| A6.0 | Exterior Elevations Building Footprint A | 03/30/18 |
| A6.1 | Exterior Elevations Building Footprint B | 03/30/18 |
| A7.0 | Building Sections & Details | 03/30/18 |
| A7.1 | MRF Details Waterproof Membrane @ Decks | 03/30/18 |
| A8.0 | Wall Sections | 03/30/18 |
| A8.1 | Wall Sections | 03/30/18 |
| A8.2 | Wall Sections | 03/30/18 |
| A9.0 | Stair Sections & Plans | 03/30/18 |
| A9.1 | Stair Details | 03/30/18 |

| | | |
|---|---|---|
| A9.2 | Stair Details | 03/30/18 |
| A10.0 | Roof Plans | 03/30/18 |
| A10.1 | Roof Details | 03/30/18 |
| A10.2 | Roof Details | 03/30/18 |
| A11.0 | Interior Elevations | 03/30/18 |
| A11.1 | Interior Details | 03/30/18 |
| A11.2 | Interior Details | 03/30/18 |
| A11.3 | Firestop Details | 03/30/18 |
| A11.4 | Firestop Details | 03/30/18 |
| S0.1 | Schedules | 04/03/18 |
| S0.2 | General Notes | 04/03/18 |
| S1.0 | Foundation Plan Building A | 04/03/18 |
| S1.1 | 2nd Floor Framing Plan Building A | 04/03/18 |
| S1.2 | 3rd Floor Framing Plan Building A | 04/03/18 |
| S1.3 | Roof Framing Plan Building A | 04/03/18 |
| S2.0 | Foundation Plan Building B | 04/03/18 |
| S2.1 | 2nd Floor Framing Plan Building B | 04/03/18 |
| S2.2 | 3rd Floor Framing Plan Building B | 04/03/18 |
| S2.3 | Roof Framing Plan Building B | 04/03/18 |
| S3.0 | Footing Details | 04/03/18 |
| S4.0 | Framing Details | 04/03/18 |
| S5.0 | Roof Framing Details | 04/03/18 |
| S6.0 | Shear Wall Schedule & Details | 04/03/18 |
| S6.1 | Shear Wall Plan Building A | 04/03/18 |
| S6.2 | Shear Wall Plan Building A | 04/03/18 |
| S6.3 | Shear Wall Plan Building B | 04/03/18 |
| S6.4 | Shear Wall Plan Building B | 04/03/18 |
| T2.0 | Title Sheet Volume 2 of 2 | 03/30/18 |
| M0.0 | Mechanical Cover Sheet | 03/30/18 |
| M0.1 | Specifications Sheet | 03/30/18 |
| M1.1 | Building A 1st Floor HVAC Plan | 03/30/18 |
| M1.2 | Building A 2nd & 3rd Floor HVAC Plan | 03/30/18 |
| M2.1 | Building B 1st Floor HVAC Plan | 03/30/18 |
| M2.2 | Building B 2nd & 3rd Floor HVAC Plan | 03/30/18 |
| M3.0 | Enlarged Unit HVAC Plans | 03/30/18 |
| M3.1 | Enlarged Unit HVAC Plans | 03/30/18 |
| M3.2 | Enlarged Unit HVAC Plans | 03/30/18 |
| M4.0 | Mechanical Details Sheet | 03/30/18 |
| M4.1 | Mechanical Details Sheet | 03/30/18 |
| M5.0 | Mechanical Schedules Sheet | 03/30/18 |
| P1.0 | Plumbing Utility Site Plan | 03/30/18 |
| P1.1 | Building A 1st Floor Plumbing Plan | 03/30/18 |
| P1.2 | Building A 2nd & 3rd Floor Plumbing Plan | 03/30/18 |
| P2.1 | Building B 1st Floor Plumbing Plan | 03/30/18 |
| P2.2 | Building B 2nd & 3rd Floor Plumbing Plan | 03/30/18 |
| P3.0 | Enlarged Unit Plumbing Plans | 03/30/18 |
| P3.1 | Enlarged Unit Plumbing Plans | 03/30/18 |
| P3.2 | Enlarged Unit Plumbing Plans | 03/30/18 |
| P4.0 | Plumbing Riser Diagrams | 03/30/18 |
| P4.1 | Plumbing Riser Diagrams | 03/30/18 |
| P5.0 | Plumbing Details Sheet | 03/30/18 |
| P5.1 | Plumbing Details Sheet | 03/30/18 |
| P6.0 | Plumbing Schedules Sheet | 03/30/18 |
| E0.0 | Electrical Cover Sheet | 03/30/18 |
| E0.1 | Lighting Compliance Report | 03/30/18 |
| E0.2 | Electrical Specifications | 03/30/18 |



2:25-ap-02008-BPH Doc# 1 Filed: 08/05/25 Page 48 of 105
EXHIBIT 1

| | | |
|---|---|---|
| E0.3 | Electrical Specifications | 03/30/18 |
| E0.4 | Electrical Specifications | 03/30/18 |
| E1.0 | Electrical Site Plan | 03/30/18 |
| E1.1 | Photometric Site Plan | 03/30/18 |
| E2.1 | Building A 1st Floor Fire Alarm Plan | 03/30/18 |
| E2.2 | Building A 2nd Floor Fire Alarm Plan | 03/30/18 |
| E2.3 | Building A 3rd Floor Fire Alarm Plan | 03/30/18 |
| E2.4 | Building A 1st Floor Lighting Plan | 03/30/18 |
| E2.5 | Building A 2nd Floor Lighting Plan | 03/30/18 |
| E2.6 | Building A 3rd Floor Lighting Plan | 03/30/18 |
| E2.7 | Building A 1st Floor Power Plan | 03/30/18 |
| E2.8 | Building A 2nd Floor Power Plan | 03/30/18 |
| E2.9 | Building A 3rd Floor Power Plan | 03/30/18 |
| E3.1 | Building B 1st Floor Fire Alarm Plan | 03/30/18 |
| E3.2 | Building B 2nd Floor Fire Alarm Plan | 03/30/18 |
| E3.3 | Building B 3rd Floor Fire Alarm Plan | 03/30/18 |
| E3.4 | Building B 1st Floor Lighting Plan | 03/30/18 |
| E3.5 | Building B 2nd Floor Lighting Plan | 03/30/18 |
| E3.6 | Building B 3rd Floor Lighting Plan | 03/30/18 |
| E3.7 | Building B 1st Floor Power Plan | 03/30/18 |
| E3.8 | Building B 2nd Floor Power Plan | 03/30/18 |
| E3.9 | Building B 3rd Floor Power Plan | 03/30/18 |
| E4.0 | Enlarged Unit Lighting Plans | 03/30/18 |
| E4.1 | Enlarged Unit Lighting Plans | 03/30/18 |
| E4.2 | Enlarged Unit Power Plans | 03/30/18 |
| E4.3 | Enlarged Unit Power Plans | 03/30/18 |
| E4.4 | Enlarged ICC Type A Unit Lighting Plans | 03/30/18 |
| E4.5 | Enlarged ICC Type A Unit Power Plans | 03/30/18 |
| E5.0 | One-Line Diagram/Electrical Schedules | 03/30/18 |
| E5.1 | One-Line Diagram/Electrical Schedules | 03/30/18 |
| E5.2 | Electrical Schedules | 03/30/18 |
| E5.3 | Electrical Schedules | 03/30/18 |
| E6.0 | Electrical Details | 03/30/18 |

**CLUBHOUSE PLANS**

| Sheet No. | Description | Date |
|---|---|---|
| T1.0 | Title Sheet | 03/30/18 |
| T1.1 | Code Review | 03/30/18 |
| T1.2 | Code Review IECC Comcheck | 03/30/18 |
| A2.0 | Main Level Floor Plan | 03/30/18 |
| A3.0 | Finish Schedule Construction Types | 03/30/18 |
| A4.0 | Door & Window Schedule | 03/30/18 |
| A4.1 | Door & Window Details | 03/30/18 |
| A6.0 | Exterior Elevations & Details | 03/30/18 |
| A6.1 | Exterior Elevations & Details | 03/30/18 |
| A7.0 | Building Sections | 03/30/18 |
| A7.1 | Building Section & Details | 03/30/18 |
| A8.0 | Wall Sections & Details | 03/30/18 |
| A8.1 | Wall Sections & Details | 03/30/18 |
| A10.0 | Roof Plan & Details | 03/30/18 |
| A10.1 | TPO Manufacturer Details | 03/30/18 |
| A11.0 | Interior Elevations | 03/30/18 |
| A11.1 | Interior Elevations & Details | 03/30/18 |
| A11.2 | Firestop Details | 03/30/18 |
| A12.0 | Reflected Ceiling Plan | 03/30/18 |

| | | |
|---|---|---|
| SC0.1 | Schedules | Not Dated |
| SC0.2 | General Notes | Not Dated |
| SC1.0 | Foundation Plan | Not Dated |
| SC1.1 | Lower Roof Plan | Not Dated |
| SC1.2 | Upper Roof Plan | Not Dated |
| SC2.0 | Foundation Details | Not Dated |
| SC2.1 | Framing Details | Not Dated |
| SC2.2 | Roof Framing Details | Not Dated |
| SC3.0 | Shear Wall Plan | Not Dated |
| SC3.1 | Shear Wall Plan | Not Dated |
| M.0 | Mechanical Cover Sheet | 03/30/18 |
| M0.1 | Energy Code Compliance Sheet | 03/30/18 |
| M0.2 | Energy Code Compliance And Controls | 03/30/18 |
| M0.3 | Specifications | 03/30/18 |
| M1.0 | HVAC Plan | 03/30/18 |
| M2.0 | HVAC Details | 03/30/18 |
| M2.1 | HVAC Details | 03/30/18 |
| M3.0 | HVAC Schedules | 03/30/18 |
| P1.0 | Waste & Vent Plan | 03/30/18 |
| P1.1 | Water & Gas Plan | 03/30/18 |
| P2.0 | Plumbing Details | 03/30/18 |
| P2.1 | Plumbing Details | 03/30/18 |
| P3.0 | HVAC Schedules | 03/30/18 |
| E0.0 | Electrical Cover Sheet | 03/30/18 |
| E0.1 | Lighting Compliance Report | 03/30/18 |
| E1.0 | Lighting Plan | 03/30/18 |
| E1.1 | Mechanical Power Plan | 03/30/18 |
| E1.2 | Power Plan | 03/30/18 |
| E1.3 | Special Systems Plan | 03/30/18 |
| E2.0 | One-Line Diagram/Electrical Schedules | 03/30/18 |
| E3.0 | Electrical Details | 03/30/18 |

**SPECIFICATIONS**

Not Applicable

**GEOTECHNICAL REPORT**

Geotechnical Investigation Report
*Dated: 08/12/16*
*Phase 1 Environmental Site Assessment*
*Dated: September 2016*

**AMENDMENTS**

Addendum #01
*Dated: 02/11/21*

**ROSE PARK IMPROVEMENTS PLANS**

| | | |
|---|---|---|
| L0.0 | Cover Sheet | 04/03/18 |
| L1.0 | Rose Park Master Plan – Overall | 04/03/18 |
| L1.1 | Rose Park Master Plan – North | 04/03/18 |
| L1.2 | Rose Park Master Plan – South | 04/03/18 |
| L2.0 | Phase 1 Landscape Notes & Legend | 04/03/18 |
| L2.1 | Phase 1 Landscape Plan | 04/03/18 |
| L2.2 | Phase 1 Landscape Plan | 04/03/18 |
| L2.3 | Phase 1 Landscape Plan | 04/03/18 |
| L2.4 | Phase 1 Landscape Plan | 04/03/18 |
| L2.5 | Phase 1 Landscape Plan – Hardscape Layout | 04/03/18 |
| L3.1 | Landscape Details | 04/03/18 |
| L3.2 | Landscape Details | 04/03/18 |
| C-1 | Rose Park Site Grading Plan | 04/18 |

**SPECIFICATIONS**

Rose Park Improvements Landscape Project Manual
*Dated: March 2018*

## DESIGN TEAM

**ARCHITECT:**
*Van Bryan Studio Architects*
*21 West Babcock Street*
*Bozeman, MT 59715*
*(406) 586-4777*

**CIVIL ENGINEER:**
*Morrison Maierle*
*2880 Technology Blvd West*
*Bozeman, MT 59718*
*(406) 587-0721*

**STRUCTURAL ENGINEER:**
*Aegis Engineering, Inc.*
*128 West Alder Street, Suite A*
*Missoula, MT 59802*
*(406) 829-3300*

**MECHANICAL/PLUMBING/ELECTRICAL ENGINEER:**
*Musgrove Engineering*
*234 South Whisperwood Way*
*Boise, ID 83709*
*(208) 384-0585*

**LANDSCAPE ARCHITECT:**
*TD & H Engineering*
*1800 River Drive North*
*Great Falls, MT 59401*
*(406) 587-0721*

# EXHIBIT C-1
## Project Safety Policy

This construction Project necessarily entails certain risks and hazards. Subcontractor must take active steps to ensure every safety precaution associated with the performance of Subcontractor's Work is strictly followed. Subcontractor's supervisors and/or employees must understand how integral accident prevention is to performance. Since more injuries occur because of unsafe acts than as a result of unsafe conditions, Subcontractor must strive to make safe work habits an integral part of daily job performance.

Contractor's management considers accident prevention the most important aspect of this Project. Contractor desires to maintain and support safe, healthful working conditions. Subcontractor must always follow operating practices that safeguard both employees and the public at the job site.

Subcontractor's mandatory requirements are as follows:

1. Subcontractor will monitor job site safety for Subcontractor's trade and scope of Work. This includes but is not limited to:
   - A. Enforcing safety rules and/or regulations.
   - B. Taking disciplinary action when necessary.
   - C. Providing adequately trained supervision for Subcontractor's scope of the Project.
   - D. Conducting and documenting weekly safety training.
   - E. Providing documentation thereof upon the request of Contractor and/or an authorized inspector.
   - F. Inspecting the job site prior to commencing Work.
   - G. Inspecting the job site regularly throughout the scope of Work.
   - H. Providing MSDS and any other information regarding safety to Contractor's Project Superintendent.
   - I. Reporting all safety violations and accidents to Contractor's Project Superintendent.
   - J. Maintaining all mandated Federal, State and Local documentation.
   - K. Providing a copy of Subcontractor's Safety Manual to Contractor's Project Superintendent for the duration of Subcontractor's performance. Submission of such Safety Manual shall in no way relieve Subcontractor from the obligations set forth under this contract.
   - L. Providing appropriate personal protective safety equipment to Subcontractor's employees.
   - M. Requiring the use of said personal protective safety equipment at all appropriate times.
   - N. Contractor's job sites are hardhat required areas at all times during construction.

2. Subcontractor shall comply with Contractor's Safety Program. Subcontractor, its Project supervision and personnel shall attend and participate in safety meetings and programs as required by Contractor.

3. Failure to comply with all safety requirements may result in a worker's removal from the job site. The removal of one or more of Subcontractor's workers does not negate Subcontractor's obligation to provide an adequate number of workers to complete Subcontractor's scope of Work in accordance with established schedules.

4. Subcontractor shall be liable for, and shall reimburse Contractor for any and all costs, penalties, losses or damages that Contractor may incur, including without limitation any attorney's fees, court costs, expert fees and judicial awards as a result of Subcontractor's violation of Federal, State or Local safety regulations, whether said violation is willful or otherwise. Said liability includes but is not limited to Federal, State or Local Occupational Safety and Health Administration (OSHA) or equivalent requirements. It is Subcontractor's responsibility to know and to understand said requirements as they relate to the scope of Work conducted by Subcontractor.

5. Repeated safety violations may result in the permanent removal of Subcontractor from the Project. Should Subcontractor be replaced as a result of repeated safety violations Subcontractor will be held liable for the difference in price between their contract and the price of the replacement Subcontractor.



2:25-ap-02008-BPH Doc# 1 Filed: 08/05/25 Page 54 of 105
EXHIBIT 1

## EXHIBIT C-2
## PROJECT PUNCHLIST PROTOCOL

In order to insure an efficient and expeditious completion of the Project Punch List, Contractor and Subcontractor agree to the following protocol.

A. DEFICIENCIES: During construction, the Project Superintendent may periodically issue to the Subcontractor a Deficiency List of items currently in need of correction. All Deficiency List items are to be corrected within a mutually agreed upon time period. This mutually agreed upon time period may be in the form of a 24 or 48 Hour Notice to Comply from Contractor to Subcontractor. After expiration of this documented time period Contractor may suspend all payments due to Subcontractor and arrange correction of the deficient items at the sole expense of the Subcontractor.

B. PUNCH LIST: The Punch List(s) shall be distributed to the Project Superintendent and the Subcontractor when received from the Architect.

Subcontractor must notify Contractor in writing within 24 hours if any of the Punch List items cannot be completed within 72 hours of receipt of the Punch List. Written notice to Contractor does not release the Subcontractor from responsibility to complete all Punch List items within the 72-hour time frame. All Punch List items will be completed within 72 hours of receipt of the Punch List.

At the conclusion of the 72-hour time frame, the Project Superintendent and the Project Manager will confirm with Owner's Representative that Subcontractor's Punch List items have been satisfactorily completed.

If the Subcontractor does not have all Punch List items satisfactorily completed at the close of the 72-hour time frame all payments owed to the Subcontractor by Contractor will be suspended until satisfactory completion of the delinquent items.

C. CHARGE BACK FOR DELINQUENT ITEMS: At the close of the 72 hour, time period any Punch List items that have not been satisfactorily completed by the Subcontractor may be immediately completed by Contractor at the sole expense of the Subcontractor.



2:25-ap-02008-BPH Doc# 1 EXHIBIT Filed: 08/05/25 Page 55 of 105

Subcontract No. 11-210026-312000

# EXHIBIT D
# SUBCONTRACTOR SUPPLIER LIST

**Subcontractor Name: McCoy Excavation, LLC.**

The following is a true, accurate, and complete list of all suppliers/vendors, subcontractors, and/or sub-subcontractors from whom we will be purchasing or have purchased either labor or materials or subcontracted items for the furtherance of our contract or purchase order from **PETRA INCORPORATED, A CORPORATION OF IDAHO** for the **Bozeman West Apartments,** project located in **2235 Tschache Lane, Bozeman, MT 59718.** Are furnishing this list for the express purpose of **PETRA INCORPORATED, A CORPORATION OF IDAHO**, being able to monitor how we are paying our bills to our vendors on this specific Project. If we purchase from any additional vendors not included on this list, we will immediately notify **PETRA INCORPORATED, A CORPORATION OF IDAHO** in writing those additional vendors when we place our orders. That, for the purpose of said contract, the omission of suppliers, materials or Lower Tier Subcontractors can be construed as deliberate and constitute fraud.

Date 7/13/21

Signature [signature]

Position Own

| SUPPLIER BUSINESS NAME | CONTACT NAME | ADDRESS, CITY, STATE | PHONE # | ESTIMATED AMOUNT |
|---|---|---|---|---|
| Core & Main | Ben Tolly | Belgrade, MT | 406-388-5980 | $300,000 |
| anderson precast | Josh m. | Belgrade, MT | 406-388-2913 | $89,000 |
| | | | | |
| | | | | |
| | | | | |
| | | | TOTAL ESTIMATED SUPPLIER AMOUNT | $ 389,000.00 |

| SUBCONTRACTOR BUSINESS NAME | CONTACT NAME | ADDRESS, CITY, STATE | PHONE # | ESTIMATED AMOUNT |
|---|---|---|---|---|
| High country paving | | Belgrade, mt | 406-388-9707 | $800,000 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

(Attach separate sheet if additional space is required)

TOTAL ESTIMATED SUBCONTRACTOR AMOUNT $ 800,000.00

# EXHIBIT E-1
# INTERIM LIEN/CLAIM WAIVER

**INTERIM LIEN/ CLAIM WAIVER**

| VENDOR: <Name><br><Address><br><City State Zip> | OWNER: <Name><br><Address><br><City State Zip> |
|---|---|
| Contact Person: | Owner's Representative: |
| Contact Telephone: | Contact Telephone. |

**CONDITIONAL RELEASE**

The undersigned does hereby acknowledge that upon receipt by the undersigned of a check from <Name of firm writing check> in the sum of <$ amount>, this document shall become effective to release, waive, and relinquish any and all claims, liens and rights of lien, or bond claims, which the undersigned may now have by reason of any labor, materials, supplies, equipment, or Work furnished to the construction project commonly known as <Name of the Project> (the "Project") and located at <Location of Project> through <date> and payment application <payment application #>. This waiver does not cover retainage or items furnished after that date or pending or unpaid changes or claims.

The undersigned, in consideration of the payment of said sum, does hereby release and forever discharge <Name of Owner>, the Payor, and their respective successors, affiliates, agents and assigns, and all of their respective subsidiaries, general partners, lenders, and employees, from any and all claims, demands, suits, causes or action of whatever kind of nature, whether based on contract, tort or otherwise, which now exist or which may arise out of, or which are in any way connected to the construction of the Project, except for those claims arising out of any labor, material, supplies or equipment furnished after the date of this waiver, and/or those claims which are specifically reserved below:

______

I CERTIFY UNDER PENALTY OF PERJURY UNDER LAWS OF THE STATE OF <STATE> THAT THE ABOVE IS A TRUE AND CORRECT STATEMENT

By:

Its: ______________________

A duly Authorized and constituted representative

Dated this <Day> day of <Month>, <Year>

______

(City, State)

**UNCONDITIONAL RELEASE**

The undersigned does hereby acknowledge that the undersigned has been paid and has received progress payments totaling the sum of $_____ and does hereby release any and all claims, liens and rights of lien, and bond claims, which the undersigned has on the above referenced job. This release covers payment for all labor, services, equipment, supplies, materials furnished and/or claims to the Project through <date>, payment application #_____ only and does not cover retainage or any items furnished after that date or pending or unpaid changes or claims.

The undersigned, in consideration of the payment of said sum, does hereby release and forever discharge <Name of Owner>, the Payor, and their respective successors, affiliates, agents and assigns, and all of their respective subsidiaries, general partners, lenders, and employees, from any and all claims, demands, suits, causes or action of whatever kind of nature, whether based on contract, tort or otherwise, which now exist or which may arise out of, or which are in any way connected to the construction of the Project, except for those claims arising out of any labor, material, supplies or equipment furnished after the date of this waiver, and/or those claims which are specifically reserved below:

______

THIS DOCUMENT WAIVES RIGHTS UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT EVEN IF YOU HAVE NOT BEEN PAID.

I CERTIFY UNDER PENALTY OF PERJURY UNDER LAWS OF THE STATE OF <STATE> THAT THE ABOVE IS A TURE AND CORRECT STATEMENT.

By: ______

Its: ______________________

A duly Authorized and constituted representative

Dated this <Day> day of <Month>, <Year>

______

(City, State)

# EXHIBIT E-2
# FINAL LIEN/CLAIM RELEASE

**FINAL LIEN/CLAIM RELEASE**

WHEREAS, the undersigned furnished labor, services, supplies, equipment, and/or materials for the Project known as <NAME OF PROJECT> located at <ADDRESS> ("the Project")

In consideration of the payments made to date and final payment of <TYPEWRITTEN AMOUNT> Dollars ($<NUMERICAL AMOUNT>), the undersigned does hereby waive any claims, liens and right to a lien, or claim on any contractor's bond or project bond on the Project, and any other claim of any nature whatsoever against the Project, or the improvements, or the Owner of the Project on account of labor, materials, or both, furnished to the undersigned, or the Project, or both, and the undersigned does further release and forever discharge <CONTRACTOR>, its surety, lender(s) and the Owner of the Project from any and all claims, demands, actions or causes of action arising out of the above-described labor and/or materials furnished by the undersigned to the Project, whether based in contract or tort. The undersigned acknowledges that all payments previously received on account of the described Project have been and are accepted in full satisfaction of contract claims, liens, or right to claim liens, pursuant to this Final Lien/Claim Release, irrespective of the form or forms of the payment. This Final Lien/Claim Release is intended to constitute a complete release of any claim, right to lien, as well as any contract claim filed, or mechanics lien recorded. This Final Lien/Claim Release shall also constitute a complete release of any personal action against the Owner of the Project to recover any amount claimed due.

The undersigned hereby warrants that it has performed the Work and/or furnished the materials pursuant to the plans and specifications or Work order and has made proper cleanup of the premises for any Work performed on the site. The undersigned further warrants that it has paid all Workmen, if any, employed by it on the Project, and the cost of all materials, supplies, services, equipment and other subcontractors, if any, used by the undersigned on the Project, including, but not limited to, any and all fringe benefits and withholding taxes for Work associated with the Project. The undersigned agrees to indemnify the Owner of the Project against any and all claims, demands, causes of action arising out of the labor and materials furnished to or on account of the Project. The undersigned warrants that there are no subcontractors, or materialmen, or any other persons whatsoever, doing Work on the Project other than those persons already specifically designated by the undersigned, that all job cost records have been reviewed and that there are no unbilled costs, that there will be no further requisitions for payment relating to the Project, and that the undersigned's Work is complete.

**<CONTRACTOR, SUBCONTRACTOR LOWER-TIER SUBCONTRACTOR, OR MATERIAL MAN>:**

By: ______________________________

Its: ______________________________

*A duly authorized and constituted representative*

Dated: ______________________________

STATE OF <STATE> )
:ss
County of <County> )

On this ___ day of ___________, 20_____, before me, the undersigned, a Notary Public in and for the State of <State>, duly commissioned and sworn, personally appeared _______________ to me known to be the _______________ of _______________, the corporation/individual that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said corporation/individual, for the uses and purposes therein mentioned, and on oath stated that he/she is authorized to execute this Final Lien/Claim Release on behalf of

_______________
Print Name: _______________
Notary Public in and for the State of <State>
Residing at: _______________
My Commission
Expires: _______________

# EXHIBIT F
# SUBCONTRACTOR PREQUALIFICATION PACKET

Subcontractor Pre-Qualification Administrated Separately Is Incorporated By Reference.

# EXHIBIT G
# SUBCONTRACTOR RESPONSIBILITY REQUIREMENTS

Not Used

# EXHIBIT H
# INDEMNIFICATION ADDENDUM

In addition to any other defense, indemnify or hold harmless obligation imposed on Subcontractor by the Subcontract, Main Contract or applicable law, Subcontractor shall, to the fullest extent permitted by law, indemnify, defend and hold harmless the Owner, Contractor, and their respective directors, officers, employees, parents and subsidiaries of any tier, representatives, agents, successors and assigns, and any and all representatives, agents, directors, officers, employees or any of the foregoing (collectively, "Indemnified Parties") from and against any and all losses, costs, expenses, damages, injuries, claims, demands, obligations, liabilities, judgments, fines, penalties, interest and causes of action, including without limitation administrative and legal costs and reasonable attorneys' fees ("Damages") involving the following:

1. Any actual or alleged infringements of any patent, trademark, copyright or other intellectual property or proprietary right by Subcontractor, its Lower-Tier Subcontractor or the Work furnished or performed by Subcontractor;

2. Death or bodily injury to persons or damage to property arising out of the fault of Subcontractor, or the fault of Subcontractor's agents, representatives or subcontractors, including but not limited to, Subcontractor's employees, consultants, sub-subcontractors and suppliers at any tier, whether or not such death or bodily injury to persons or damage to property arises out of the fault of any of the Indemnified Parties but in such event only to the extent such death or bodily injury or damage to property arises out of the fault of Subcontractor, or the fault of Subcontractor's agents, representatives or subcontractors, including but not limited to Subcontractor's employees, consultants, sub-subcontractors and suppliers at any tier; Injury or death to any person, or damage to or destruction of any property (including loss of use thereof), or any other damage or loss by whomsoever suffered resulting from or arising out of or in connection with the Work, whether or not any such damage or loss is due to the negligence of any kind or character or other fault of any one or more of the Indemnified Parties or breach of any statutory duty, contractual obligation or other obligation by one or more of the Indemnified Parties;

3. Any failure of the Subcontractor or the Work to comply with the requirements of the Subcontract;

4. Any lien, claim, security interest or other encumbrance made or filed against: (a) the Work, Project site and the Project; any and all interests and estates therein and any and all improvements and materials places on the Project site by Subcontractor or its Lower Tier Subcontractors; or (b) any payment, performance, lien prevention, or lien discharge bond posted by any of the Indemnified Parties;

5. Any hazardous material or waste, toxic substance, pollution or contamination brought to or generated on the Project site by Subcontractor or its Lower-Tier Subcontractor, or used, handled, transported, stored, removed, remediated, disturbed or disposed of by Subcontractor or its Lower- Tier Subcontractor; and

6. Any other claim or demand asserted against Contractor as a result or an act, omission, services, Work, product or fault of Subcontractor or Subcontractor's agents, representatives or subcontractors, including but not limited to Subcontractor's employees, consultants, Lower Tier Subcontractors and suppliers at any tier.

The foregoing obligations of Subcontractor shall not be affected or limited in any way by any insurance required of or provided to Subcontractor under the Subcontract. If a temporary restraining order or preliminary injunction is granted in any proceeding involving a claim, demand or cause of action covered by clause (1) above, Subcontractor shall make every reasonable effort at its own expense to secure the suspension of the restraining order or injunction by giving a satisfactory bond or otherwise. If any portion of the Work is held in such proceeding to

constitute an infringement and the use thereof is permanently enjoined, Subcontractor shall at its own expense promptly secure a license authorizing Contractor's and Owner's continued use of such Work, or, if Subcontractor is unable to secure such a license, replace the affected Work or modify it so that it is qualified as non-infringing. Subcontractor shall not be required to indemnify, defend and hold harmless any Indemnified Party for Damages resulting, or to result from that Indemnified Party's sole negligence or intentional misconduct.

To the fullest extent permitted by law, Subcontractor shall furthermore defend all Indemnified Parties against any and all Damages that are alleged to have occurred in whole or in part by the result of or due to the act, omission, negligence or fault of Subcontractor, its employees, consultants, agents, representatives, Lower Tier Subcontractors and suppliers at any tier.

Defense cost recovery shall include all fees (of attorneys and experts), and costs and expenses incurred in good faith. In addition, Contractor shall be entitled to recover compensation for all of its in-house expenses (including materials and labor) consumed in its defense.

Without limiting the generality of the foregoing, Subcontractor's obligations of indemnity and defense specifically apply, to the fullest extent permitted by law, to claims arising out of the injury or death to Subcontractor's own employees, and Subcontractor's obligations thereof are not limited by provisions of any Worker's Compensation or similar statute and Subcontractor waives any immunity thereunder as to these obligations. Further, except as expressly required by law, no indemnification or defense obligation under the Subcontract shall be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable to or for any third-party under workers' compensation acts; provided Subcontractor's waiver of immunity by the provisions of this paragraph extends only to claims against Subcontractor by Contractor, and does not include, or extend to, any claims by Subcontractor's employees directly against Subcontractor.

Subcontractor's obligations under this Section apply to any claims, demands, suits and other matters covered by this Section even though such claims may prove to be false, groundless or fraudulent.

In the event any claim for Damages, by a third-party arising from, resulting from, or connected with the services to be performed under the Subcontract by Subcontractor (its agents, and Lower Tier Subcontractors and suppliers of any tier) is made against Contractor, before the expiration of any limitation imposed by any Applicable Law (which is defined to include any applicable statute of limitations or repose), and even though such claim may prove to be false, groundless or fraudulent, Subcontractor agrees that its indemnity and defense obligations to Contractor under the Subcontract shall survive any limitations imposed by any Applicable Law. In such event, notwithstanding any provision to the contrary in any Applicable Law, Contractor's claim for indemnity or defense against Subcontractor shall not accrue, and any applicable statute of limitation or repose shall not begin to run, until Contractor's payment of (i) a final judgment; (ii) an arbitration award; or (iii) a settlement of any Damages.


Case 2:25-ap-02008-BPH Doc# 1 Filed: 08/05/25 Page 63 of 105

# EXHIBIT I
## MONTANA ADDENDUM

**Article 4 - Payments is amended to include the following:**

(i) It is expressly agreed that as a condition precedent to any payment obligation by Contractor to Subcontractor hereunder the Contractor must first receive a corresponding payment from the Owner for the Work of Subcontractor for which payment is sought. Subcontractor specifically agrees that it is relying upon the Owner's credit (not the Contractor's) for payment, and Subcontractor specifically accepts the risk of nonpayment by the Owner

(ii) To the extent that payment is received from Owner, and as a condition precedent to Contractor's obligation to pay Subcontractor, progress payments to Subcontractor for satisfactory performance of Subcontractor's Work shall be made seven (7) calendar days after receipt by Contractor of payment from Owner for such Subcontractor's Work and after receipt of all items required from Subcontractor prior to payment.

(iii) Any billing or estimate submitted by Subcontractor under this Subcontract shall be in strict accordance with the provisions of this Subcontract, shall be submitted in or before the monthly billing deadline specified in the Subcontract and Exhibit A thereto, in the form and detail prescribed by Contractor, shall be accompanied by appropriate notarized conditional waivers of any construction, mechanic's or materialman's lien from Subcontractor and from each person performing labor or supplying materials, products, equipment or services used in the Work, and shall be personally certified by Subcontractor's principal executive officer, evidenced by his or her signature and notarized verification, that:

(1) the signing officer has reviewed the billing or estimate;
(2) based on the officer's knowledge, the billing or estimate does not include any amounts for which Subcontractor is not entitled to payment under the terms of this Subcontract and mutually accepted modifications;
(3) based on such officer's knowledge, the billing or estimate fairly present in all material respects the amounts due and unpaid to Subcontractor as of the date stated; and
(4) that as a condition precedent to any payment obligation by Contractor to Subcontractor hereunder the Contractor must first receive a corresponding payment from the Owner for the Work of Subcontractor for which payment is sought.

Such certification is mutually agreed to be a material provision of this Subcontract.

(iv) Nothing in this Subcontract shall obligate Contractor to pay or to request payment for amounts withheld by the Owner, unsatisfactory work progress, defective construction work, materials or products not remedied, or disputed work, materials or products, nor in the event of Subcontractor's failure to comply with material provisions of this Subcontract, Subcontractor's failure to make timely payments for labor, equipment, materials and products, damage to Contractor, another subcontractor, the public or the Owner, reasonable evidence that the Work cannot be completed for the unpaid balance of the Subcontract Amount, or retainage not due. Contractor will review payment applications submitted by Subcontractor and Contractor may disapprove of a pay application, in part or in whole, by providing written notification to Subcontractor within 21 days from the date the application was submitted. Contractor shall submit the undisputed portion of the Subcontractor's payment application to Owner for payment according to the terms in the Subcontract and Main Contract.

DocuSign Envelope ID: D33B4649-2D24-4DC4-A377-18C64959E01C

# APPLICATION AND CERTIFICATION FOR PAYMENT

AIA DOCUMENT G 702

TO OWNER:
Bozeman West Apatments LP
101 East Front St Ste 304
Missoula, MT 59802

PROJECT: Bozeman West Apartments
2235 Tschache Lane
Bozeman, MT 59718

APPLICATION NO. 1
PERIOD TO: 7/31/2021
PROJECT NO. 11-21-0026

DISTRIBUTE TO:
OWNER
ARCHITECT
CONTRACTOR
FIELD
OTHER

FROM CONTRACTOR:
Petra Incorporated
1097 N Rosario St Ste 200
Meridian, ID 83642

VIA ARCHITECT:

CONTRACT DATE:

1. ORIGINAL CONTRACT SUM .......... 30,595,941.00
2. NET CHANGE BY CHANGE ORDERS .......... 0.00
3. CONTRACT SUM TO DATE (Line 1 + 2) .......... 30,595,941.00
4. TOTAL COMPLETED AND STORED TO DATE .......... 473,896.60
   (Column G on G703)
5. RETAINAGE
   a. 5.00 OF Completed Work 23,694.83
   (Columns D+B on G703)
   b. ____ OF Stored Material
   (Column F on G703)
   Total Retainage (Line 5a + 5b or Total to Column I of G 703) 23,694.83
6. TOTAL EARNED LESS RETAINAGE .......... 450,201.77
   (Line 4 less line 5 Total)
7. LESS PREVIOUS CERTIFICATES FOR PAYMENT .......... 0.00
   (Line 6 from prior Certificate
   Sales Tax Due This Invoice 0.00% $0.00
8. CURRENT PAYMENT DUE .......... 450,201.77
9. BALANCE TO FINISH, INCLUDING RETAINAGE 30,145,739.23

| CHANGE ORDER SUMMARY | ADDITIONS | SUBTRACTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | | |
| Total approved this Month | | |
| Totals | | |
| NET CHANGES by Change Order | | |

The undersigned Contractor certifies that to the best of the Contractors knowledge , information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work which previous Certificates for Payment were issued and payments received from the Owner , and that current payment shown herein is now due.

Contractor: [signature]
State of: Idaho
County of: Ada

Subscribed and sworn to before me this 10th day of Aug 2021

Notary Public: [signature]
My Commission Expires: 2-8-25

DIANA J HEIMBERGER Comm. No. 20190246 NOTARY PUBLIC Expires: 02/08/2025 STATE OF IDAHO

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents , based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect 's knowledge information and belief the Work has progressed as indicated , the quality of the work is in accordance with the Contract Documents , and the Contractor is entitled to payment of the AMOUNT CERTIFIED .

AMOUNT CERTIFIED .......... $________
(Attach explanation if amount certified differs from the amount applied for . Initial all figures on this application and on the Continuation sheet that are changed to conform to the amount certified .)

BY: ________ Date: ________

This Certificate is not negotiable The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under his Contract .

EXHIBIT 2

AIA Document G 702, APPLICATION AND CERTIFICATION FOR PAYMENT ,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use column 1 on the Contacts where variable retainage for the line items may apply .

APPLICATION NO. 1
APPLICATION DATE: 7/31/2021
PERIOD TO: 7/31/2021
PROJECT NO. 11-21-0026

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREV APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (Not in D or E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 01-0500 | Survey | 49,240.00 | | | | | | 49,240.00 | |
| 01-1000 | General Conditions/Supervision | 733,472.00 | | | | | | 733,472.00 | |
| 01-1001 | General Requirements | 102,289.00 | | | | | | 102,289.00 | |
| 01-4500 | Inspection & Testing | 45,760.00 | | | | | | 45,760.00 | |
| 01-5010 | Onsite Storage & Containers | 25,000.00 | | | | | | 25,000.00 | |
| 01-5100 | General Labor & Lift Equipment | 45,000.00 | | | | | | 45,000.00 | |
| 01-5620 | Temporary Site Fencing | 25,000.00 | | | | | | 25,000.00 | |
| 01-5720 | Dewatering & SWPPP Maint/Ins| | 75,000.00 | | | | | | 75,000.00 | |
| 01-6310 | Winter Conditions - Allowance | 150,000.00 | | | | | | 150,000.00 | |
| 01-7300 | Liability Insurance | 81,181.00 | | | | | | 81,181.00 | |
| 01-7310 | Owner's Builders' Risk | 200,000.00 | | | | | | 200,000.00 | |
| 01-7423 | Final Cleaning | 47,429.00 | | | | | | 47,429.00 | |
| 03-3400 | Gypsum Concrete/Sound Mat | 306,981.00 | | | | | | 306,981.00 | |
| 03-3510 | Building Concrete | 1,200,000.00 | | | | | | 1,200,000.00 | |
| 03-5720 | Precast Stair Tread - Material | 41,680.00 | | | | | | 41,680.00 | |
| 04-4000 | Stone Siding | 81,514.00 | | | | | | 81,514.00 | |
| 05-5000 | Metal Fabrications | 524,974.00 | | | | | | 524,974.00 | |
| 06-1100 | Rough Framing - Labor | 1,708,500.00 | | | | | | 1,708,500.00 | |
| 06-1101 | Rough Framing - Materials | 4,000,000.00 | | | | | | 4,000,000.00 | |
| 06-1102 | Rough Framing - Trusses | 499,869.00 | | | | | | 499,869.00 | |
| 06-3000 | Siding - Labor | 619,132.00 | | | | | | 619,132.00 | |
| 06-3001 | Siding - Materials | 675,773.00 | | | | | | 675,773.00 | |
| 07-1000 | Waterproofing | 112,143.00 | | | | | | 112,143.00 | |
| 07-2000 | Building Insulation | 383,189.00 | | | | | | 383,189.00 | |
| 07-5000 | Roofing | 539,900.00 | | | | | | 539,900.00 | |

DocuSign Envelope ID: D33B4649-2D24-4DC4-A377-18C64959E01C

AIA Document G 702, APPLICATION AND CERTIFICATION FOR PAYMENT ,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar .
Use column 1 on the Contacts where variable retainage for the line items may apply .

APPLICATION NO. 1
APPLICATION DATE: 7/31/2021
PERIOD TO: 7/31/2021
PROJECT NO. 11-21-0026

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREV APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (Not in D or E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 07-6100 | Metal Roofing/Siding | 105,779.00 | | | | | | 105,779.00 | |
| 07-9000 | Joint Sealants & Firestopping | 59,338.00 | | | | | | 59,338.00 | |
| 08-1410 | Doors/Frames/Hardware-Install | 519,870.00 | | | | | | 519,870.00 | |
| 08-1411 | Doors/Frames/Hardware-Materia | 537,830.00 | | | | | | 537,830.00 | |
| 08-3300 | Overhead Doors | 7,595.00 | | | | | | 7,595.00 | |
| 08-3400 | Attic Access Doors | 3,600.00 | | | | | | 3,600.00 | |
| 08-4000 | Storefronts | 74,930.00 | | | | | | 74,930.00 | |
| 08-7900 | Fire Lock Boxes | 2,500.00 | | | | | | 2,500.00 | |
| 08-8000 | Mirrors | 50,820.00 | | | | | | 50,820.00 | |
| 09-2100 | Gypsum Wallboard - Install | 1,230,520.00 | | | | | | 1,230,520.00 | |
| 09-2101 | Gypsum Wallboard - Materials | 487,405.00 | | | | | | 487,405.00 | |
| 09-6800 | Flooring -Sheet Vinyl & Carpet | 521,537.00 | | | | | | 521,537.00 | |
| 09-7000 | Clubhouse Finishes&Specialties | 95,595.00 | | | | | | 95,595.00 | |
| 10-1400 | Signage (Buildings & Units) | 26,816.00 | | | | | | 26,816.00 | |
| 10-1414 | Monument Sign | 35,000.00 | | | | | | 35,000.00 | |
| 10-3000 | Fireplace | 21,958.00 | | | | | | 21,958.00 | |
| 10-4400 | Fire Extinguishers | 8,100.00 | | | | | | 8,100.00 | |
| 10-5600 | Mailboxes | 14,935.00 | | | | | | 14,935.00 | |
| 10-5800 | Metal Shelving | 18,000.00 | | | | | | 18,000.00 | |
| 11-3000 | Residential Appliances | 744,668.00 | | | | | | 744,668.00 | |
| 12-2000 | Window Blinds | 95,000.00 | | | | | | 95,000.00 | |
| 12-3000 | Cabinets & Countertops | 823,279.00 | | | | | | 823,279.00 | |
| 12-9300 | Bike Racks | 14,419.00 | | | | | | 14,419.00 | |
| 13-1100 | Design Build Pool - Allowance | 186,033.00 | | | | | | 186,033.00 | |
| 13-3400 | Carports | 282,700.00 | | | | | | 282,700.00 | |


EXHIBIT 2

AIA Document G 702, APPLICATION AND CERTIFICATION FOR PAYMENT, containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use column 1 on the Contacts where variable retainage for the line items may apply.

APPLICATION NO. 1
APPLICATION DATE: 7/31/2021
PERIOD TO: 7/31/2021
PROJECT NO. 11-21-0026

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREV APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (Not in D or E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 19-9500 | OH&P | 1,315,104.00 | | | | | | 1,315,104.00 | |
| 19-9700 | Contingency | 431,746.00 | | | | | | 431,746.00 | |
| 21-0100 | Fire Sprinkler | 404,967.00 | | | | | | 404,967.00 | |
| 22-0100 | Plumbing | 2,948,000.00 | | | | | | 2,948,000.00 | |
| 22-4000 | Fixtures - Materials | 318,388.00 | | | | | | 318,388.00 | |
| 22-4001 | Fixtures - Materials | 77,332.00 | | 60,069.60 | | 60,069.60 | 77.68 | 17,262.40 | 3,003.48 |
| 23-0100 | HVAC | 1,471,573.00 | | | | | | 1,471,573.00 | |
| 25-0100 | Dehumidistats | 10,800.00 | | | | | | 10,800.00 | |
| 26-0100 | Electrical Labor | 2,525,213.00 | | | | | | 2,525,213.00 | |
| 26-5000 | Lighting Fixtures | 283,025.00 | | | | | | 283,025.00 | |
| 28-1000 | Entry FOB System | 50,000.00 | | | | | | 50,000.00 | |
| 31-2000 | Earthwork | 2,047,800.00 | | 413,827.00 | | 413,827.00 | 20.21 | 1,633,973.00 | 20,691.35 |
| 32-8000 | Landscape & Irrigation | 320,740.00 | | | | | | 320,740.00 | |
| 32-8001 | Rose Park Landscaping & Irrig | 150,000.00 | | | | | | 150,000.00 | |
| | TOTALS | 30,595,941.00 | 0.00 | 473,896.60 | 0.00 | 473,896.60 | 1.55 | 30,122,044.40 | 23,694.83 |

# INTERIM LIEN/ CLAIM WAIVER

| | |
|---|---|
| VENDOR Shower Walls S.A. de C.V<br>Carr. San Mateo KM 5.2<br>Juarez, Nuevo Leon 67250 | OWNER Bozeman West Apartments, LP<br>101 E. Front Street, Suite #304<br>Missoula, MT 59802 |
| Contact Person: Karen Borunda | Owner's Representative: |
| Contact Telephone: 323-284-4460 | Contact Telephone: |

## CONDITIONAL RELEASE

The undersigned does hereby acknowledge that upon receipt by the undersigned of a check from Bozeman West Apartments, LP in the sum of $57,066.12, this document shall become effective to release, waive, and relinquish any and all claims, liens and rights of lien, or bond claims, which the undersigned may now have by reason of any labor, materials, supplies, equipment, or Work furnished to the construction project commonly known as Bozeman West Apartments (the "Project") and located at 101 E. Front Street, Suite #304 Missoula, MT 59802 through 7/31/21 and payment application #1. This waiver does not cover retainage or items furnished afterthat date or pending or unpaid changes or claims.

The undersigned, in consideration of the payment of said sum, does hereby release and forever discharge Bozeman West Apartments, LP the Payor, and their respective successors, affiliates, agents and assigns, and all of their respective subsidiaries, general partners, lenders, and employees, from any and all claims, demands, suits, causes or action of whatever kind of nature, whether based on contract, tort or otherwise, which now exist orwhich may arise out of, or which are in any way connected to the construction of the Project, except for those claims arising out of any labor, material, suppliesor equipment furnished after the date of this waiver, and/or those claims which are specifically reserved below:

______________________________

I CERTIFY UNDER PENALTY OF PERJURY UNDER LAWS OF THE STATE OF <STATE> THAT THE ABOVE IS A TRUE AND CORRECT STATEMENT.

By: Shower walls

Its: Sales Ops Mgr

A duly Authorized and constituted representative

Dated this <Day> day of <Month>, <Year> — 10 08 2021

Juarez, NL

(City, State)

## UNCONDITIONAL RELEASE

The undersigned does hereby acknowledge that the undersigned has been paid and has received progress payments totaling the sum of <$amount> and does herebyrelease any and all claims, liens and rights of lien, and bond claims, which the undersigned has on the above referenced job. This release covers payment for all labor, services, equipment, supplies, materials furnishedand/or claims to the Project through <date>, payment application < # > only and does not cover retainage or any items furnished after that date or pending or unpaidchanges or claims.

The undersigned, in consideration of the payment of said sum, does hereby release and forever discharge Bozeman West Apartments, LP, the Payor, and their respective successors, affiliates, agents and assigns, and all of their respective subsidiaries, general partners, lenders, and employees, from any and all claims, demands, suits, causes or action of whatever kind of nature, whether based on contract, tort or otherwise, which now exist orwhich may arise out of, or which are in any way connected to the construction of the Project, except for those claims arising out of any labor, material, suppliesor equipment furnished after the date of this waiver, and/or those claims which are specifically reserved below:

______________________________

THIS DOCUMENT WAIVES RIGHTS UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT EVEN IF YOU HAVE NOT BEEN PAID.

I CERTIFY UNDER PENALTY OF PERJURY UNDER LAWS OF THE STATE OF MONTANA THATTHE ABOVE IS A TURE AND CORRECT STATEMENT.

By: Shower Walls

Its: Sales Ops Mgr

A duly Authorized and constituted representative

Dated this <Day> day of <Month>, <Year>

Juarez, NL

(City, State)





EXHIBIT 2

# INTERIM LIEN/ CLAIM WAIVER

| | |
|---|---|
| VENDOR McCoy Excavation, LLC<br>190 Rock Road, Unit C<br>Belgrade, MT 59714 | OWNER Bozeman West Apartments, LP<br>101 E. Front Street, Suite #304<br>Missoula, MT 59802 |
| Contact Person: Christian McCoy | Owner's Representative: |
| Contact Telephone: 316-759-9364 | Contact Telephone: |

## CONDITIONAL RELEASE

The undersigned does hereby acknowledge that upon receipt by the undersigned of a check from Bozeman West Apartments, LP in the sum of $393,135.65, this document shall become effective to release, waive, and relinquish any and all claims, liens and rights of lien, or bond claims, which the undersigned may now have by reason of any labor, materials, supplies, equipment, or Work furnished to the construction project commonly known as Bozeman West Apartments (the "Project") and located at 101 E. Front Street, Suite #304 Missoula, MT 59802 through 7/31/21 and payment application #1. This waiver does not cover retainage or items furnished afterthat date or pending or unpaid changes or claims.

The undersigned, in consideration of the payment of said sum, does hereby release and forever discharge Bozeman West Apartments, LP the Payor, and their respective successors, affiliates, agents and assigns, and all of their respective subsidiaries, general partners, lenders, and employees, from any and all claims, demands, suits, causes or action of whatever kind of nature, whether based on contract, tort or otherwise, which now exist orwhich may arise out of, or which are in any way connected to the construction of the Project, except for those claims arising out of any labor, material, supplies or equipment furnished after the date of this waiver, and/or those claims which are specifically reserved below:

______________________________

I CERTIFY UNDER PENALTY OF PERJURY UNDER LAWS OF THE STATE OF <STATE> THAT THE ABOVE IS A TRUE AND CORRECT STATEMENT.

By: ____________________

Its: Christian McCoy - Owner

A duly Authorized and constituted representative

Dated this 10th day of August, 2021

Bozeman, Montana
(City, State)

## UNCONDITIONAL RELEASE

The undersigned does hereby acknowledge that the undersigned has been paid and has received progress payments totaling the sum of <$amount> and does herebyrelease any and all claims, liens and rights of lien, and bond claims, which the undersigned has on the above referenced job. This release covers payment for all labor, services, equipment, supplies, materials furnishedand/or claims to the Project through <date>, payment application < # > only and does not cover retainage or any items furnished after that date or pending or unpaidchanges or claims.

The undersigned, in consideration of the payment of said sum, does hereby release and forever discharge Bozeman West Apartments, LP, the Payor, and their respective successors, affiliates, agents and assigns, and all of their respective subsidiaries, general partners, lenders, and employees, from any and all claims, demands, suits, causes or action of whatever kind of nature, whether based on contract, tort or otherwise, which now exist orwhich may arise out of, or which are in any way connected to the construction of the Project, except for those claims arising out of any labor, material, supplies or equipment furnished after the date of this waiver, and/or those claims which are specifically reserved below:

______________________________

THIS DOCUMENT WAIVES RIGHTS UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT EVEN IF YOU HAVE NOT BEEN PAID.

I CERTIFY UNDER PENALTY OF PERJURY UNDER LAWS OF THE STATE OF MONTANA THAT THE ABOVE IS A TURE AND CORRECT STATEMENT.

By: ____________________

Its: ____________________

A duly Authorized and constituted representative

Dated this <Day> day of <Month>, <Year>

____________________
(City, State)

**Bozeman West Apartments**
**Pay Application #01**
**For Work Done in July 2021**

| Scope | Subcontractor/Supplier | Address | City, State | Contact | Phone # | Email | Check Instructions | Total Billed | Retainage | Retainage % | Net Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| General Contractor | Petra, Inc. | 1097 N. Rosario St, Ste 200 | Meridian, ID 83642 | Diana Heimberger | 208-493-2730 | dheimberger@petrainc.net | Mail | $ - | $ - | 5.00% | $ - |
| Shower Walls | Fixtures - Materials | 1100 W. Beech Ave Apt 11 | McAllen, TX 78501 | Karen Borunda | 323-284-4460 | karen.borunda@shower-walls.net | Mail | $ 60,069.60 | $ 3,003.48 | 5.00% | $ 57,066.12 |
| McCoy Excavation, LLC | Earthwork | P.O. Box 4784 | Bozeman, MT 59772 | Christian McCoy | 316-759-9364 | christian@mccoyexcavation.com | Mail | $ 413,827.00 | $ 20,691.35 | 5.00% | $ 393,135.65 |
| | | | | | | | TOTALS | $ 473,896.60 | $ 23,694.83 | 5.00% | $ 450,201.77 |

Contractor: [signature] 8/10/21
Signature Date

Owner's Rep: DocuSigned by: [signature] 8/16/2021
Signature Date

Owner: DocuSigned by: [signature] 8/15/2021
Signature Date





EXHIBIT 2

DocuSign

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: D33B46492D244DC4A37718C64959E01C | | Status: Completed |
| Subject: Petra PA #1- Please sign this document | | |
| Source Envelope: | | |
| Document Pages: 7 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Liz Scaggs |
| AutoNav: Enabled | | PO Box 9079 |
| EnvelopeId Stamping: Enabled | | Missoula, MT 59807 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | lscaggs@farranco.com |
| | | IP Address: 13.84.41.82 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>8/15/2021 8:24:28 AM | Holder: Liz Scaggs<br>lscaggs@farranco.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Dave Krawczyk<br>dave@projectpro1.com<br>Security Level: Email, Account Authentication (None) | <br>Signature Adoption: Pre-selected Style<br>Using IP Address: 107.2.55.197 | Sent: 8/15/2021 8:30:03 AM<br>Viewed: 8/16/2021 7:13:17 AM<br>Signed: 8/16/2021 7:14:04 AM |

**Electronic Record and Signature Disclosure:**
Accepted: 8/16/2021 7:13:17 AM
ID: 977f2668-d458-49c7-93cc-e98b934b2cc9

| | | |
|---|---|---|
| Pat Corrick<br>jpcorrick@farranco.com<br>Managing Partner<br>Farran Realty Partners<br>Security Level: Email, Account Authentication (None) | <br>Signature Adoption: Drawn on Device<br>Using IP Address: 97.85.86.161 | Sent: 8/15/2021 8:30:03 AM<br>Viewed: 8/15/2021 9:02:15 AM<br>Signed: 8/15/2021 9:02:47 AM |

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/15/2021 8:30:03 AM |
| Certified Delivered | Security Checked | 8/15/2021 9:02:15 AM |
| Signing Complete | Security Checked | 8/15/2021 9:02:47 AM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Completed | Security Checked | 8/16/2021 7:14:04 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Farran Realty Partners (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Farran Realty Partners:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: lscaggs@farranco.com

**To advise Farran Realty Partners of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at lscaggs@farranco.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Farran Realty Partners**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to lscaggs@farranco.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Farran Realty Partners**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to lscaggs@farranco.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Farran Realty Partners as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Farran Realty Partners during the course of your relationship with Farran Realty Partners.

PETRA GENERAL CONTRACTORS

*Pursuit of Excellence*

# 48 HOUR NOTICE

**PROJECT:** Bozeman West Apartments

**SUBCONTRACTOR:** McCoy Excavation

**DATE:** 08/23/21

**Take notice that pursuant to the Subcontract, you are in breach for the following:**

1. Not providing adequate manpower.
2. Falling behind on mass excavation.

**Please provide a recovery plan, acceptable to Petra, outlining your intentions for correcting the above noted issues within 48 hours of issuance of this notice. Said recovery plan shall address specific and measurable actions, with durations, necessary to accomplish the intended remediation. Should said plan be unacceptable to Petra, or should you fail to provide said plan within the time allotted, Petra will pursue all contractual remedies available to itself for protecting its interest in this project.**

October 29th, 2021

**Via U.S. Mail and E-Mail**
McCoy Excavation, LLC
c/o Christian McCoy (christian@mccoyexcavation.com)
190 Rock Road, Unit C
Belgrade, MT 59714

Re: 2nd 48-Hour Notice of Default and Demand to Cure Pursuant to Section 11.4 of Subcontract No. 11-210026-312000

Project: Bozeman West Apartments Project, 2235 Tschache Lane, Bozeman, MT 59718

Dear Mr. McCoy:

This letter serves as Petra, Inc.'s forty-eight (48) hour contractual notice of default pursuant to Section 11.4 of that certain Subcontract between McCoy Excavation, LLC's ("McCoy" or "Subcontractor") and Petra, Inc. ("PETRA" or "Contractor") dated July 13, 2021 (the "Subcontract") in connection with the construction of the Bozeman West Apartments Project (the "Project"). Capitalized terms used in this notice shall have the same meanings set forth in the Subcontract.

As detailed below and as documented in numerous prior notices and correspondence from PETRA to McCoy, McCoy is in default due to its failure to procure equipment and materials and provide an adequate amount of labor to perform the Work as necessary to maintain the Project Schedule. Specifically, among other defaults, McCoy has failed to procure utility piping and other essential materials (despite PETRA advancing McCoy funds to procure these materials), and has failed to provide sufficient manpower and crews to perform its Erosion Control including critical SWPPP work, Site Excavation, Demolition, and Subgrade prep activities as necessary to maintain the Project Schedule. More recently, McCoy demobilized from the site and has not progressed any of its scope of work for 6 weeks.

PETRA previously sent a written 48-hour notice of default on August 23, 2021 (enclosed with this Notice) relating to McCoy's project delays and defaults and requested McCoy correct the defaults and provide a recovery plan to recover the Project Schedule and mitigate delays. In addition, PETRA has repeatedly requested information and updates from McCoy relating to its Work and any expected issues or delays to its material procurement and has offered to assist McCoy with these issues. Unfortunately, McCoy did not respond to PETRA's August 23, 2021 48-hour notice and has failed to correct its defaults or otherwise respond to PETRA's prior notices, communications, and requests for information. Moreover, McCoy has not increased its crew size or taken any other steps to progress its work in order to mitigate and minimize the delays and impacts to the Project Schedule. These critical project delays caused by McCoy have impacted the overall Project Schedule and will continue to cause impacts and delays to successor work activities and the overall Project. While PETRA would prefer to work through these project delays and issues with McCoy, to date McCoy has failed to respond to PETRA, has failed to develop an acceptable recovery plan, and has failed to communicate and update PETRA.

The Subcontract contains several provisions that make it clear that "time is of the essence" with respect to McCoy's performance of the Work. (Subcontract, Sections 3.1 and24.4). More specifically, Section 3.2 and 3.3 of the Subcontract (copied below) required McCoy to all actions necessary to recover from delays upon notice from PETRA including increasing manpower and equipment, and increasing shifts and workdays:

3.2 Should Subcontractor fail in any respect to prosecute the Work with promptness and diligence and in such manner so as not to delay Contractor or the progress of the Project, or if the progress of the Work is such that in the Contractor's sole opinion the completion of the Work or any part thereof within the Project Schedule is doubtful and Contractor gives Subcontractor written notice thereof, Subcontractor agrees to take all action necessary to recover from the delay to ensure the completion of the Work or any part thereof within the time specified in the Project Schedule, including but not limited to any or all of the following: increase construction manpower in critical quantities and crafts; increase the number of working hours per shift; increase the number of shifts per working day; increase the number of working days per week; increase the amount of construction equipment; or, perform any combination of the foregoing actions. Subcontractor agrees that it shall have no claim for any adjustment in the Subcontract price, or extension of time, or reimbursement because of extra expenses occasioned by compliance with this Section 3.2. Compliance with this Section 3.2 shall not release or relieve Subcontractor from any other obligation or liability assumed under this Subcontract or imposed by applicable laws.

3.3 Should Subcontractor, or any Lower-Tier Subcontractor fail to meet any milestone date set forth in the Contract Documents and in the Project Schedule, and they fail to take necessary action as described in 3.1 within 24 hours, Contractor can supplement the Subcontractor's construction workforce, construction equipment or any combination thereof to ensure the completion of the Work or any part thereof within the time specified, at the sole expense of the Subcontractor. Subcontractor agrees that it shall have no claim for any adjustment in the Subcontract price or extension of time, or reimbursement because of extra expenses occasioned by compliance with this Section or the Subcontract.

McCoy has failed to comply with its obligations under Sections 3.2 and 3.3 and now appears to have totally abandoned its Work on the Project. Further, pursuant to Sections 11.4, "If Subcontractor refuses or fails to supply enough properly-skilled workers or materials to maintain

the Project Schedule . . . and fails to correct the default and maintain the corrected condition within not less than forty-eight (48) hours of receipt of written notice of default, then Contractor . . . shall have the right to any and all of the following remedies:

1. Supply such numbers of workers and quantity of materials, equipment, and other facilities as Contractor deems necessary for the completion of Subcontractor's Work, or any part thereof, , and to charge the cost thereof to Subcontractor who shall be liable for such damages including reasonable overhead and profit.

2. Perform or contract with one or more additional Lower Tier Subcontractors to perform such part of Subcontractor's Work as Contractor shall determine to provide prompt completion of the Project and charge the cost thereof to Subcontractor.

3. Withhold payment of any monies due or to become due Subcontractor pending corrective action to the extent required and to the satisfaction of Contractor.

4. Terminate this Subcontract, use any materials, implements, equipment, appliances, or tools furnished or belonging to Subcontractor to complete Subcontractor's Work and furnish those materials, equipment, and/or employ such workers as Contractor deems necessary to maintain the orderly progress of the Work. All of the costs, including reasonable overhead, profit, costs, and attorneys' fees, incurred by Contractor in arranging to and performing Subcontractor's Work shall be charged to Subcontractor and Contractor shall have the right to deduct such expenses from monies due or to become due to Subcontractor. Subcontractor shall be liable for the payment of any costs, expenses, or other actual or consequential damages incurred by Contractor that are in excess of the unpaid balance of the Subcontract Price.

With this letter, PETRA is providing McCoy a second and final Notice of Default Pursuant to Section 11.4 of the Subcontract and requests that McCoy correct these defaults and maintain the corrected conditions within 48-hours of this notice. In addition, PETRA requests that McCoy submit a status update and recovery schedule detailing its plan to recover and mitigate the above delays and defaults. If McCoy fails to correct the defaults identified above within forty-eight (48) hours and continues to ignore PETRA's requests for updates and information, PETRA will be forced to exercise its right to terminate the Subcontract under Section 11.4 and exercise any and all other rights and remedies available under the Agreement and applicable laws.

Sincerely,

Petra, Inc.

PETRA GENERAL CONTRACTORS™

*Pursuit of Excellence*

January 10, 2021

**Via U.S. Mail and E-Mail**
McCoy Excavation, LLC
c/o Christian McCoy (christian@mccoyexcavation.com)
190 Rock Road, Unit C
Belgrade, MT 59714

Re: Notice of Termination Pursuant to Section 11.4 of Subcontract No. 11-210026-312000

Project: Bozeman West Apartments Project, 2235 Tschache Lane, Bozeman, MT 59718

Dear Mr. McCoy:

This letter follows up on Petra, Inc.'s October 29, 2021 2nd 48-Hour Notice of Default and Demand to Cure (the "Notice of Default") issued pursuant to that certain Subcontract between McCoy Excavation, LLC's ("McCoy" or "Subcontractor") and Petra, Inc. ("PETRA" or "Contractor") dated July 13, 2021 (the "Subcontract") in connection with the construction of the Bozeman West Apartments Project (the "Project"). Capitalized terms used in this notice shall have the same meanings set forth in the Subcontract.

Despite multiple requests and granting McCoy numerous opportunities to cure, McCoy has failed entirely to respond to the issues in the Notice of Default or cure any of its performance defaults, including McCoy's failure to procure utility piping and other essential materials (despite PETRA advancing McCoy funds to procure these materials), and failure to provide sufficient manpower and crews to perform its Erosion Control including critical SWPPP work, Site Excavation, Demolition, and Subgrade prep activities as necessary to maintain the Project Schedule. At this point, McCoy has completely abandoned its work and obligations under the Subcontract, have stolen and misappropriated trust funds advanced to McCoy, and have failed to respond to numerous requests for accounting information and backup documentation relating to prior payments to McCoy by PETRA.

In light of McCoy's uncured material breaches and defaults under the Subcontract, and without waiving any other right, remedy, or claim under the Subcontract or applicable laws, PETRA is hereby exercising its right to terminate the Subcontract for default effective immediately pursuant to Section 11.4 of the Subcontract.

In addition, and more alarming, is that McCoy has refused to return or otherwise account for the trust funds advanced to McCoy as specifically for procurement of the utility piping materials totaling $388,827 in McCoy's Certified Application for Payment #1. These funds were advanced by PETRA to McCoy with the expectation that they would be applied for material procurement but we now know (and Mr. McCoy has admitted) that such funds were not used to procure any utility piping materials.

Specifically, to induce PETRA to issue payment for Application for Payment #1, McCoy represented, agreed, and certified that: (1) said payment is in strict compliance with the terms and conditions of the Subcontract; and (2) that said payment shall be received as a trust fund and applied by McCoy, first for the discharge of obligations for all labor, subcontract work, materials, supplies, services, etc. in connection with the Project. Section 4.5 of the Subcontract further provides that payment accepted by McCoy "shall be held in trust in favor of its laborers, materialmen…" and Section 4.6 provides that payments "shall be deemed advances and are subject to adjustment at any time prior to final payment for errors, overpayment…" PETRA relied on these representations in approving and issuing payment of $393,135.65, of which $388,827 was specifically to be utilized for procurement of piping materials. A copy of Payment Application No. 1 containing these representations, which was signed and certified by McCoy is enclosed.

PETRA has repeatedly requested that McCoy account for these advanced trust funds. While Mr. McCoy admitted it had not used the funds for the stated purpose of procuring materials, McCoy has not returned the funds to PETRA or otherwise accounted for the use of any portion of these funds. Accordingly, PETRA demands that McCoy immediately return the advanced amount to PETRA. Should McCoy fail to do so, without waiving any other rights and remedies available to PETRA under the Subcontract or applicable laws, PETRA will be forced to initiate formal litigation against McCoy and will assert all available claims including for breach of the Subcontract, theft, conversion, misrepresentation, and fraud.

Sincerely,

Jeffrey Diehl

Digitally signed by Jeffrey Diehl
DN: C=US, E=jdiehl@petrainc.net, O="Petra, Inc.", CN=Jeffrey Diehl
Date: 2022.01.11 14:45:22-07'00'

Jeffrey Diehl
Director of Construction, ID

CC: Project File
Brett Myron, Petra

AMERICAN ARBITRATION ASSOCIATION®

# CONSTRUCTION ARBITRATION RULES DEMAND FOR ARBITRATION

| | | |
|---|---|---|
| **Mediation:** If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box ☐. There is no additional administrative fee for this service. | | |
| Name of Respondent: McCoy Excavation, LLC; and Christian McCoy | | |
| Address: 190 Rock Road, Unit C | | |
| City: Belgrade | State: Montana | Zip Code: 59714 |
| Phone No.: (316) 759-9364 | Fax No.: | |
| Email Address: christian@mccoyexcavation.com | | |
| Name of Representative (if known): Eric Edward Nord, Esq. | | |
| Name of Firm (if applicable): Crist, Krogh, Alke & Nord, PLLC | | |
| Representative's Address: The Securities Building, 2708 First Avenue North, Suite 300 | | |
| City: Billings | State: Montana | Zip Code: 59101 |
| Phone No.: (406) 255-0400 | Fax No.: (406) 255-0697 | |
| Email Address: enord@cristlaw.com | | |
| The named claimant, a party to an arbitration agreement dated 07/13/2021, which provides for arbitration under the Construction Industry Rules of the American Arbitration Association, hereby demands arbitration. | | |
| **Arbitration Clause:** Please indicate whether the contract containing the dispute resolution clause governing this dispute is a standard industry form contract (such as AIA, ConsensusDOCS or AGC) or a customized contract for the specific project.<br><br>Contract Form: Customized contract for the specific project | | |
| The Nature of the Dispute:<br><br>See attached Demand for Arbitration | | |
| Dollar Amount of Claim: $ 393,135.65 , plus replacement costs and other actual and consequential damages | | |
| Other Relief Sought: ☑ Attorneys Fees ☑ Interest ☑ Arbitration Costs ☑ Punitive/Exemplary<br>☐ Other: | | |
| Amount Enclosed: $ 4,000.00<br>In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☑ Standard Fee Schedule | | |
| Please describe appropriate qualifications for arbitrator(s) to be appointed to hear this dispute:<br><br>Construction Attorney with 15+ years experience with construction claims and disputes involving contractor defaults. | | |
| Hearing Locale Requested: Boise, Idaho | | |
| Project Site: Bozeman, MT | | |

| | | |
|---|---|---|
| Estimated Time Needed for Hearings Overall: | hours or 3 | days |
| Specify Type of Business: Claimant: Petra Incorporated | Respondent: McCoy Excavation, LLC; and Christian McCoy | |
| You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement. | | |
| Signature (may be signed by a representative): [signature] | Date: 02/22/2022 | |
| Name of Claimant: Petra Incorporated | | |
| Address (to be used in connection with this case): c/o Berg Hill Greenleaf Ruscitti LLP, 1712 Pearl Street | | |
| City: Boulder | State: Colorado | Zip Code: 80302 |
| Phone No.: (303) 402-1600 | Fax No.: (303) 402-1601 | |
| Email Address: jps@bhgrlaw.com; geoffrey.gardner@bhgrlaw.com | | |
| Name of Representative: Jack P. Storti; and Geoffrey Gardner | | |
| Name of Firm (if applicable): Berg Hill Greenleaf Ruscitti LLP | | |
| Representative's Address: 1712 Pearl Street | | |
| City: Boulder | State: Colorado | Zip Code: 80302 |
| Phone No.: (303) 402-1600 | Fax No.: (303) 402-1601 | |
| Email Address: jps@bhgrlaw.com; geoffrey.gardner@bhgrlaw.com | | |
| Notice: To begin proceedings, **please file online at www.adr.org/fileonline**. You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee. | | |

**<u>AMERICAN ARBITRATION ASSOCIATION</u>**
Construction Industry Arbitration Rules of the AAA

AAA Case Number:

In the Matter of the Arbitration Between:

PETRA, INC.
Claimant

v.

MCCOY EXCAVATION, LLC.; and
CHRISTIAN MCCOY,
Respondents.

---

**DEMAND FOR ARBITRATION**

---

Claimant, Petra, Inc. ("**Claimant**" or "**Petra**"), by and through undersigned counsel, Berg Hill Greenleaf Ruscitti LLP, and hereby submits its Demand for Arbitration against Respondents McCoy Excavation, LLC and Christian McCoy (collectively, the "**Respondents**") and states as follows:

**<u>AGREEMENT TO ARBITRATE AND VENUE</u>**

1. The applicable Subcontract between the parties includes an agreement to arbitrate claims, disputes, and other matters arising out of the Subcontract conducted under the Construction Industry Rules of the American Arbitration Association. *See* Subcontract, Article 22.2 (Arbitration) attached hereto as <u>Exhibit 1</u>. Therefore, the AAA has jurisdiction over this matter.

2. The Subcontract provides that all arbitration proceedings shall be held in Boise, Idaho.

**<u>GENERAL ALLEGATIONS AND DESCRIPTION OF CLAIMS</u>**

3. Petra is a validly registered Idaho corporation with a mailing address at 1097 N.

Rosario St., Ste. 200, Meridian, ID 83642.

4. Respondent McCoy Excavation, LLC ("**McCoy Excavation**") is a validly registered Montana limited liability company with a principal address of 190 Rock Rd., Unit C, Belgrade, MT 59714.

5. Respondent Christian McCoy ("**McCoy**") is the registered agent of McCoy Excavation.

6. Upon information and belief, McCoy is the sole owner and managing member of McCoy Excavation.

7. McCoy was the signatory to the Subcontract on behalf of McCoy Excavation.

8. McCoy exercises control over the finances and operations of McCoy Excavation.

9. On or about May 13, 2021, Petra entered into a construction contract with Bozeman West Apartments, LP to be the general contractor for a multi-building, 216-unit apartment complex ("**Project**") at 2235 Tschache Ln., Bozeman, MT ("**Project Site**").

10. On or about July 13, 2021, Petra entered into a subcontract ("**Subcontract**") (attached hereto as Exhibit 1) with McCoy Excavation.

11. The Subcontract included a "time is of the essence" provision. Exhibit 1 at 7, 22.

12. Per the terms of the Subcontract, McCoy Excavation agreed to "provide all labor, equipment and materials for all Earthwork, Exterior Improvements, Site Concrete, Asphalt Paving, Striping, Signage & Utilities" for the Project.

13. The full scope of McCoy Excavation's work was outlined in further detail in the Subcontract, and included "all piping" for (1) "all water and fire lines and connect to mains as required – including taps," (2) "all storm drain system," and (3) "sanitary sewer lines of all types and sizes." Exhibit 1 at 25-26.

14. The timely procurement and installation of utility, storm water, and sanitary sewer, and related underground piping necessary for initial site work and excavation for the Project were critical to maintain the Project schedule.

15. After the Subcontract was executed, Mr. McCoy represented that McCoy Excavation was unable to secure the necessary credit from a supplier to purchase the necessary piping for the Project.

16. To facilitate McCoy Excavation's acquisition of the piping for the Project, Petra permitted McCoy Excavation to submit a payment application for the funds necessary to purchase the piping.

17. On or about July 31, 2021, McCoy Excavation submitted its first Application for Payment ("**Pay App 1**") (attached hereto as Exhibit 2). The total amount of the Pay App 1 was $413,827.00. The $413,827.00 was comprised of $25,000.00 for mobilization, $129,609.00 for "Sanitary Sewer," $129,609.00 for "Water/Fire," and $129,609.00 for "Storm Sewer." Exhibit 2 at 2.

18. On or about August 4, 2021, Mr. McCoy executed Pay App 1, which included representations that McCoy Excavation agreed "[t]hat said payment shall be received as a trust fund and applied by the undersigned, first for the discharge of his obligations for all labor, subcontract work, materials, equipment, supplies, services, sales taxes, use taxes, payroll taxes, etc. in connection with this project." Exhibit 2 at 1.

19. Mr. McCoy executed Pay App 1 to induce Petra to approve and issue payment for the amounts set forth therein.

20. On or about August 4, 2021, Mr. McCoy signed a Conditional Waiver and Release of Lien for $393,135.65.

21. On or about August 15, 2021, Petra approved Pay App 1 and issued payment to McCoy Excavation totaling $393,135.65

22. Of the $393,135.65 paid to McCoy Excavation, $388,827.00 was an advance of funds to procure piping for the Project.

23. As of the date of this filing, McCoy Excavation has not delivered any piping to the Project Site.

24. In or about August 2021, agents of Petra observed that McCoy Excavation was not providing sufficient manpower to complete necessary work in a timely manner.

25. Due to McCoy Excavation's lack of manpower, work on the excavation was slower than scheduled and delaying the Project.

26. Petra notified McCoy Excavation that it needed to provide more manpower to avoid further delays.

27. On or about August 23, 2021, Petra provided its first 48 Hour Notice of Default to McCoy Excavation (attached hereto as Exhibit 3).

28. Petra's first 48 Hour Notice stated that McCoy Excavation was in default of the Subcontract by failing to provide adequate manpower on the Project and falling behind schedule on the mass excavation.

29. Petra directed McCoy Excavation to cure those defaults and provide a recovery plan detailing how McCoy Excavation would remedy the stated Subcontract defaults.

30. McCoy Excavation failed to provide Petra with a recovery plan within forty-eight hours of the delivery of the first 48 Hour Notice or at any point thereafter.

31. McCoy Excavation failed to cure the stated defaults within forty-eight hours of the delivery of the first 48 Hour Notice

32. The Subcontract required McCoy Excavation to provide sufficient, properly trained manpower to conform with the Project schedule. Exhibit 1 at 15.

33. The Subcontract further states that failure to provide sufficient manpower is a breach of the Subcontract.

34. In the event of such failure to provide sufficient manpower, Petra could avail itself of various remedies, including, but not limited to:

a. Supplying its own workers and holding McCoy Excavation liable for the damages, overhead and profit;

b. Withholding payment to McCoy Excavation; or,

c. Terminating the Subcontract and holding McCoy Excavation liable for costs, expenses, and any other actual or consequential damages.

35. In the Subcontract, McCoy Excavation provided the names of suppliers for materials on the Project. Exhibit 1 at 40. McCoy Excavation specified "Core + Main" as a supplier. Core + Main was designated as the piping supplier for McCoy Excavation's work on the Project.

36. In or about September 2021, Petra contacted Core + Main regarding the piping and learned that McCoy Excavation had not ordered the piping for the Project.

37. In or about September 2021, Petra requested confirmation that McCoy Excavation had ordered piping for the Project.

38. As of the date of this filing, McCoy Excavation has not provided Petra with any confirmation of ordering the piping and no piping has been delivered to the Project Site from McCoy or its suppliers.

39. In or about September 17, 2021, Petra observed that McCoy Excavation did not have any workers present at the Project Site.

40. On or about October 29, 2021, Petra provided its second 48 Hour Notice to McCoy

Excavation (attached hereto as Exhibit 4).

41. Petra's second 48-Hour Notice stated that McCoy Excavation was in default of the Subcontract by:

a. Failing to provide adequate manpower on the Project;

b. Falling behind schedule on numerous work items, including erosion control, SWPPP work, site excavation, demolition, and subgrade preparation work;

c. Failing to procure necessary material, including piping;

d. Failing to take necessary actions to remedy delays following the receipt of written notice of such delays; and,

e. Failing to take necessary action to provide increased manpower following the receipt of written notice of failure to prosecute work with promptness and diligence.

42. McCoy Excavation failed entirely to respond to the second 48-Hour Notice of Default and failed cure or attempt to cure the various breaches of the Subcontract.

43. On or about January 10, 2022, Petra sent a Notice of Termination to McCoy Excavation (attached hereto as Exhibit 5).

44. The Notice of Termination stated that the grounds for termination of the Subcontract included:

a. Failure to procure materials, including piping;

b. Failure to provide sufficient manpower to maintain the Project schedule;

c. Failure to account for the advancement of funds for the utility piping; and,

d. Failure to cure breaches detailed in the first and second 48-Hour Notices.

45. Upon information and belief, and based on the facts set forth above, Mr. McCoy is an insider and alter ego of McCoy Excavation and justice requires that Mr. McCoy be jointly responsible for the debts and liabilities of McCoy Excavation.

46. Upon information and belief, and based on the facts set forth above, Mr. McCoy has exercised, and continues to exercise, substantial control over McCoy Excavation, uses McCoy Excavation to transact his personal business, and treats funds belonging to McCoy Excavation as though they were his own. Mr. McCoy has exerted complete autonomy and control over McCoy Excavation and exerted domination over its policies, finances, and business practices, such that McCoy Excavation does not have an identity independent of Mr. McCoy.

47. McCoy Excavation is therefore a mere instrumentality for the transaction of Mr. McCoy's own affairs, and there is such a unity of interest in ownership that the separate personalities of Mr. McCoy and McCoy Excavation no longer exist.

48. Justice therefore requires recognizing the substance of the relationship over the corporate form because Mr. McCoy has used the corporate fiction to commit torts and perpetuate a fraud.

49. An equitable result will be achieved by disregarding the corporate form of McCoy Excavation and holding Mr. McCoy liable for the breaches, torts, debts and obligations of McCoy Excavation, including joint liability for the claims asserted by Petra in this action. Mr. McCoy should not be able to benefit from the fraudulent misappropriations, thefts, breaches, and conversion described above by hiding behind a corporate shield that is nothing more than a sham.

## FIRST CAUSE OF ACTION
**Breach of Contract**
**(Against McCoy Excavation, LLC and Against McCoy Individually and/or as the Alter-Ego of McCoy Excavation)**

50. Petra incorporates all allegations contained herein by reference.

51. Petra and McCoy Excavation voluntarily entered into the Subcontract, which is a valid and enforceable contract.

52. McCoy Excavation agreed to provide all necessary materials and labor for the Project consistent with the scope defined in the Subcontract.

53. McCoy Excavation agreed to complete work in a timely manner, in accordance with the Project schedule.

54. Petra paid McCoy Excavation pursuant to the Subcontract, including advancing funds to supply the piping for the Project.

55. McCoy Excavation was obligated to perform its obligations under the Subcontract, including to provide sufficient manpower to keep the project on schedule and to provide materials and piping for the Project.

56. McCoy Excavation breached its obligation by failing to provide the necessary manpower and materials for the Project and failing to complete work in accordance with the Project schedule.

57. McCoy Excavation's failure to provide necessary manpower and materials for the Project damaged Plaintiff.

58. McCoy Excavation's breaches of the Subcontract caused damage to Petra including but not limited to damages and additional costs and expenses incurred by Petra arising from McCoy Excavation's delays and failures to perform under the Subcontract; loss of funds advanced to McCoy Excavation for procurement of piping; and damages and costs relating to Petra's replacement of McCoy Excavation to perform McCoy Excavation's scope of work.

59. McCoy is personally liable for his own intentional and wrongful acts, conversions, misappropriations, and breaches of independent duties owed to Petra, as detailed above. In the alternative, McCoy is personally liable as the alter-ego of McCoy Excavation.

## SECOND CAUSE OF ACTION
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Against McCoy Excavation, LLC and Against McCoy Individually and/or as the Alter-Ego of McCoy Excavation)**

60. Petra incorporates all allegations contained herein by reference.

61. The Subcontract included an implied covenant of good faith and fair dealing.

62. Petra advanced funds to McCoy Excavation to secure piping for the Project and to mobilize to the Project Site.

63. McCoy Excavation failed to mobilize sufficient manpower or provide necessary materials.

64. Petra notified McCoy Excavation of the deficiencies in performance under the Subcontract.

65. McCoy Excavation failed to timely cure such deficiencies, even when given subsequent notices and additional time to cure.

66. McCoy Excavation did not intend to perform its obligations under the Subcontract.

67. Petra was damaged by McCoy's failures to comply with standards of good faith and fair dealing implied under the Subcontract.

68. McCoy is personally liable for his own intentional and wrongful acts, conversions, misappropriations, and breaches of independent duties owed to Petra, as detailed above. In the alternative, McCoy is personally liable as the alter-ego of McCoy Excavation

## THIRD CAUSE OF ACTION
**Fraud**
**(Against McCoy Excavation, LLC and Against McCoy Individually and/or as the Alter-Ego of McCoy Excavation)**

69. Petra incorporates all allegations contained herein by reference.

70. McCoy, acting on behalf of McCoy Excavation, represented that McCoy

Excavation would use funds advanced by Petra to procure the piping on the Project.

71. Respondents did not use the advanced funds provided to purchase piping or for any other work or services for the benefit of the Project.

72. Respondents' representation that the funds Plaintiff provided would be used to purchase piping was material.

73. Upon information and belief, Respondents knew such representation regarding the purchase of piping was false.

74. Respondents intended that Petra would rely on the statement, and in so doing pay McCoy Excavation.

75. Petra was unaware that Respondents did not intend to purchase piping with the money advanced to Respondents.

76. Petra relied on Respondents' representations regarding the future purchase of piping for the Project.

77. Petra's reliance on Respondents' representation was reasonable.

78. Petra paid money to Respondents for the piping and was damaged when the funds were not used to purchase the piping.

79. McCoy is personally liable for his own intentional and wrongful acts, conversions, misappropriations, and breaches of independent duties owed to Petra, as detailed above. In the alternative, McCoy is personally liable as the alter-ego of McCoy Excavation

## FOURTH CAUSE OF ACTION
**Constructive Fraud**
**(Against McCoy Excavation, LLC and Against McCoy Individually and/or as the Alter-Ego of McCoy Excavation)**

80. Petra incorporates all allegations contained herein by reference.

81. McCoy, acting on behalf of McCoy Excavation, represented that McCoy

Excavation would use funds provided by Petra for piping on the Project.

82. McCoy Excavation did not use the funds provided to purchase piping.

83. McCoy's representations caused McCoy Excavation to gain an advantage by receiving funds from Petra.

84. Petra relied on McCoy's representations to Petra's prejudice.

85. Petra paid money to Respondents for the piping and was damaged when the funds were not used to purchase the piping.

86. McCoy is personally liable for his own intentional and wrongful acts, conversions, misappropriations, and breaches of independent duties owed to Petra, as detailed above. In the alternative, McCoy is personally liable as the alter-ego of McCoy Excavation.

**<u>FIFTH CAUSE OF ACTION</u>**
**Conversion**
**(Against McCoy Excavation, LLC and Christian McCoy Individually and/or as the Alter-Ego of McCoy Excavation)**

87. Petra incorporates all allegations contained herein by reference.

88. Petra owns the trust funds that were paid to McCoy Excavation pursuant to the Subcontract.

89. Petra has requested that Respondents return the funds paid to McCoy Excavation since Respondents failed to purchase the piping that the funds were supposed to be used for.

90. Respondents have refused to return the funds, and have not provided the piping for the Project.

91. Upon information and belief, McCoy and/or McCoy Excavation misappropriated the funds paid by Petra and used said funds for other projects, personal reasons unrelated to the Project, and/or are still in possession of said funds.

92. As owner of McCoy Excavation, McCoy had access to and control over the funds

paid by Petra to McCoy Excavation.

93. Petra has been damaged by the loss of the funds and the Respondents conversion and misappropriation.

94. McCoy is personally liable for his own intentional and wrongful acts, conversions, misappropriations, and breaches of independent duties owed to Petra, as detailed above. In the alternative, McCoy is personally liable as the alter-ego of McCoy Excavation

**SIXTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Against McCoy Excavation, LLC and Christian McCoy Individually and/or as the Alter-Ego of McCoy Excavation)**

95. Petra incorporates all allegations contained herein by reference.

96. Respondents received a benefit when Petra paid McCoy Excavation in accordance with Pay App 1.

97. Respondents knew it received Petra's payment and appreciated the payment.

98. Respondents have retained the benefit of Petra's payment without providing the benefits that Petra was paying for.

99. It would be inequitable for McCoy Excavation or McCoy to retain the benefit.

100. McCoy is personally liable for his own intentional and wrongful acts, conversions, misappropriations, and breaches of independent duties owed to Petra, as detailed above. In the alternative, McCoy is personally liable as the alter-ego of McCoy Excavation.

**WHEREFORE**, Petra respectfully requests an award in its favor and against Respondents, jointly and severally, for all actual, consequential, and compensatory damages, interest, attorneys' fees and costs, and for any further and greater relief as the Arbiter deems just and proper.

RESPECTFULLY submitted February 22, 2022.

*/s/ Jack P. Storti*
Jack P. Storti
Geoffrey Gardner
BERG HILL GREENLEAF RUSCITTI LLP
1712 Pearl Street
Boulder, CO 80302
(303) 402-1600
jps@bhgrlaw.com
geoffrey.gardner@bhgrlaw.com
Attorneys for Petra, Inc.

**AMERICAN ARBITRATION ASSOCIATION**
Construction Industry Arbitration Rules

**Case No. 01-22-0000-7583**

***Petra Incorporated***
**Claimant,**

***v.***

***McCoy Excavation, LLC, and Christian McCoy***
**Respondents.**

---

## FINAL AWARD OF ARBITRATOR

THE UNDERSIGNED ARBITRATOR was designated and appointed in accordance with the arbitration agreement under Article 22.2 of that certain July 13, 2021, "Standard Subcontract Form" agreement between Claimant Petra Incorporated and Respondent McCoy Excavation, LLC, in connection with Claimant's prime contract for the construction of a large apartment complex in Bozeman, Montana, for Bozeman West Apartments, LCL, for construction of an apartment complex in Bozeman, Montana. Respondent Christian McCoy, individually, is a guarantor under the operative contract and as such is bound by its terms. Mr. McCoy separately confirmed in writing his agreement to participate in this arbitration and to be bound thereby.

Dates for evidentiary hearings were initially set for September 26-28, 2022, but were rescheduled at Respondents' request, initially to allow them to retain counsel and subsequently, after counsel's withdrawal, on representations that then-projected hearing dates in March 2023 were unworkable. On January 31, 2023, Mr. McCoy responded to the Arbitrator's email attempting to set a date for a renewed scheduling conference by stating that none of the suggested dates would work for him, that he understood that "the show must go on," but also advising that he would no longer communicate with the Arbitrator, the Case Administrator or Claimant's counsel except through Respondents' own counsel, which had not at that time been retained. Since that January 31, 2023, email, attempted email transmissions to Mr. McCoy have been rejected as undeliverable, and the Case Administrator's written notices sent by certified mail have been ignored or rejected, as well.

Rule R-32 of the Construction Industry Arbitration Rules allows an arbitration to proceed "in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement." Further, "[t]he arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award in whatever form the arbitrator deems appropriate, including conducting the hearings through document submissions only, videoconference, or telephonically."

In light of Respondents' failure to participate in scheduled status conferences or otherwise to respond to written notice delivered in by mail in accordance with the Rules, the Arbitrator, by his Report of Preliminary Hearing and Scheduling/Case Management Order #3, dated February 23, 2023, granted Claimant's request to convert the hearing to one on document submissions only, providing to Respondents both notice of that conversion and an opportunity to request an in-person evidentiary hearing. Consistent with deadlines established in that same Order, Claimant timely submitted its hearing brief and a detailed submission of documents comprising the evidence offered in support of its claims. Respondents, after due notice by mail in accordance with the Rules, have failed to appear, have failed to oppose or otherwise to respond to Claimants' submission and have offered no submission supporting alleged counterclaims.

It was apparent from Claimant's submissions that the total of the claims outlined in its briefing and advanced upon the proffered evidence exceeded the amount of its demand. Under the circumstances, and by an order dated July 14, 2023, the Arbitrator reopened the hearing and afforded to Claimant the opportunity under the Rules to amend its arbitration demand, also affording to Respondent the opportunity to respond to any such amendment. By email correspondence dated July 27, 2023, at 8:11 p.m., MDT, Claimant's attorney, Jack P. Storti, confirmed that Claimant did not intend to submit an amended claim and also confirmed its understanding that any award in its favor would be limited to the amount of its original demand, even if a greater amount is supported by the evidence. Upon that waiver, and there being no amended demand to which Respondent may have rights to respond, the Arbitrator declared the hearing closed as of 8:15 p.m. on July 27, 2023.

Under these circumstances, oral hearings having thus been waived, and the Arbitrator having fully reviewed and considered the written documents and briefing submitted by Claimant, the Arbitrator, being duly sworn, hereby issues his FINAL AWARD as follows:

**CLAIMS AT ISSUE**

The essence of Claimant's claims against Respondents is breach of contract and lies in Respondents' failure to honor the terms and conditions of the McCoy Excavation subcontract with Claimant, a contract to which Christian McCoy, personally, was a guarantor for McCoy Excavation. In additional to failures to satisfy contractual obligations, including breach of implied covenants of good faith and fair dealings, Claimant has raised and submitted evidence supporting claims against both Respondents of fraud, constructive fraud and conversion relating to Respondents' actions and activities in eliciting and receiving from Petra payment of $369,385.65 for piping materials and services that Respondents had not purchased and did not purchase. Claimant also seeks interest calculated on the total of converted funds, plus attorneys' fees and costs.

The dispute arises under a subcontract that, by its terms, is to be considered to have been made in and to be interpreted under the laws of the state of Montana, as the state of the Project. The substantive laws of Montana thus presumptively apply. Procedurally, the Construction Industry Rules of Arbitration of the AAA (and, to the extent consistent with said Rules, the Montana Uniform Arbitration Act) apply.

Claimant has submitted multiple exhibits supporting by a preponderance of the evidence both the legal bases for its substantive claims and its calculation of damages attributable as a matter of law to the various claims. The evidence supports the conclusion that Respondents were inattentive to their contractual obligations to Claimant, justifying termination of the McCoy subcontract. The evidence further supports the conclusion that Respondents wrongfully elicited and wrongfully converted and retained payment of substantial funds on representations that the funds were needed for and were to be directed to the payment of piping materials and services, which Respondents failed to provide.

Based on Claimant's submittals and applying applicable law, and on the preponderance of the evidence, the Arbitrator finds and rules as follows:

1. That Petra suffered damages exceeding $393,135.56 resulting from Respondents' breach of contract (Petra's Claim 1), including their breach of the implied covenant of good faith and fair dealing (Petra's Claim 2) - comprising the total expended by Petra in completing or otherwise accomplishing the scope of McCoy's subcontract ($4,555,412.29)[1] less the original subcontract

[1] Evidence supports this calculation based on the following: (a) $3,963,950.00 paid to Williams Civil Construction plus (b) $393,135.00 paid to McCoy prior to its termination, plus (c) $198,327.29 for Petra's direct purchase of piping materials that McCoy failed to procure from payments received. Claimant claims an additional $265,135.65 in what it styles an "overpayment" to McCoy for work actually accomplished. To include this "overpayment" to the damage calculation would improperly inflate the calculation, as the total of all payments to McCoy, including the

amount ($2,047,720.00). Petra is entitled to recover its damages for Respondents' breach of contract, limited by the amount of its demand, and is also entitled to recover $56,406.28 in attorneys' fees and costs to date in attorneys' fees, as the prevailing party, pursuant to the parties' contract.

2. That Petra suffered damages exceeding $265,135.65 [2] from Respondents' tortious actions, including fraudulent inducement of payments received for, but not used to purchase piping material (Petra's Claim 3), constructive fraud (Petra's Claim 4) as an alternative to fraud, and conversion (Petra's Claim 5)[3]

3. That, in addition to the damages calculated for Respondents' conversion of trust funds on Petra's Claim 5, Petra is also entitled to recover pre-judgment interest in the amount of $52,765.63 on the $265,135.65 wrongfully retained by Respondents, plus $56,406.28 in attorneys' fees and costs to date, for compensable time and expenses to recover such converted funds.

4. That, because adequate legal remedies are available Petra is not entitled to recover on its Claim 6 for unjust enrichment.

Notwithstanding the foregoing findings in Claimant's favor on the various and separate claims, the nature of the claims and related measure of damage applicable to each, varying from contract damages (calculated as the costs of completing the scope of McCoy's subcontract following its termination for breach in excess of the original subcontract amount) to damages arising in tort (fraud, constructive fraud, and conversion) involve and create overlapping or duplicative calculations. Under those circumstances, Claimant has acknowledged that it does not seek duplicative damages, and the Arbitrator will not award such, as duplication would be contrary to governing Montana law, which requires that "damages must in all cases be reasonable." MONT. CODE ANN. § 27-1-302(1) (2021).

Against this standard, stripping the calculation of damages of duplications and otherwise considering all appropriate legal standards, and (as noted above) limiting Claimant's recovery to the amount of its original demand, the Arbitrator determines Claimant Petra Incorporated ("Petra") is entitled to recover from Respondents McCoy Excavation, LLC, and Christian McCoy, jointly and severally, and is hereby **AWARDED** as follows:

---

"overpayment," is included in the excess costs of completion. However, as noted below, and separate from contract damages, $265,135.65 represents that portion of payments wrongfully elicited by Respondents and wrongfully retained in excess of the value of work actually furnished under their subcontract, prior to termination.

[2] This amount is equal to the overpayment to McCoy for work actually performed and thus wrongfully retained by McCoy - an amount that the Arbitrator finds to be the proper measure of damages attributable to Respondents' wrongful actions or activities on all tort counts, including conversion.

[3] The Arbitrator acknowledges that Montana law establishes the measure of damages for conversion on terms that support a calculation equal to the $369,385.65 that Claimant maintains to have been the total of the trust funds elicited and wrongfully retained by Respondents. However, inasmuch as Claimant acknowledges that Respondents furnished labor or materials to the project totaling approximately $104,000.00, the Arbitrator concludes that the actual damages resulting from or attributable to the conversion of funds is equal to the amount Respondents retained in excess of the value of work actually furnished. Ultimately, however, and since the damages attributable to the tort claims are overshadowed by the contract damages, the precise calculation of the damages for conversion is less material than it would be if the claims against Respondents were based only in tort.

1. Money damages totaling **$393,135.56**, limited as such to the amount of Claimant's demand; and
2. **$52,765.63** in pre-judgment interest on the Trust Funds converted by Respondents and on other tort claims; and
3. **$56,406.28** in attorneys' fees and costs to date.

The administrative fees of the American Arbitration Association totaling $6,650.00 and the compensation of the arbitrator totaling $9,990.00 shall be borne by Respondents, McCoy Excavation, LLC, and Christian McCoy. Therefore, Respondent shall reimburse the additional sum of $8,995.00, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant, Petra Incorporated.

Combining the award of the principal amount of Claimant's claim and the award of administrative and arbitrator fees as provided herein, Claimant's award against Respondents, jointly and severally, totals **$511,302.47.**

The Arbitrator further awards Petra all applicable post-award interest and post-award attorneys' fees and costs.

The Arbitrator determines that Respondents are not entitled to relief on any asserted counterclaims or other affirmative relief and awards $0.00 to Respondents, for lack of any supporting evidence.

This Award is in full resolution of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

__August 10, 2023___
Date

David W. Slaughter
Arbitrator

.


2:25-ap-02008-BPH Doc#: 1 Filed: 08/05/25 Page 101 of 105

FILED
11/29/2023
*Sandy Erhardt*
CLERK
Gallatin County District Court
STATE OF MONTANA
By: Amariah Mitchell
DV-16-2023-0000903-AU
McElyea, Rienne H.
3.00

**MONTANA EIGHTEENTH JUDICIAL DISTRICT COURT**
**GALLATIN COUNTY**

| | | |
|---|---|---|
| PETRA INC.,<br><br>Applicant,<br>vs.<br><br>McCOY EXCAVATION, LLC and<br>CHRISTIAN MARK McCOY,<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Cause No. DV-16-2023-0000903-AU<br><br><br>**ORDER CONFIRMING ARBITRATION AWARD** |

## Introduction

On September 19, 2023, Petra Inc. ("Petra"), filed its Petition to Confirm Arbitration Award and Brief in Support (the "Petition"). Petra filed the Petition pursuant to § 27-5-311, Mont. Code Ann., asking this Court to confirm the Final Award of Arbitrator (the "Final Award") issued by Arbitrator, David W. Slaughter (the "Arbitrator") on August 10, 2023. Petra attached a copy of the Final Award as Exhibit 1 to the Petition. The Respondents have not made an appearance in this matter or filed any responsive pleadings. Further, more than ninety (90) days has passed since the Arbitrator issued the Final Award through the American Arbitration Association (the "AAA"). From its review of the Petition and Brief in Support, the Court is fully advised.

## Background

The underlying arbitration proceeding between the parties (the "Arbitration") was administered through the AAA before the Arbitrator in *Petra Inc. v. McCoy Excavation, LLC, and Christian McCoy*, AAA Case No. 01-22-0000-7583. The Arbitration was administered pursuant to Article 22.2 of the Petra Standard Subcontract Form, a copy of which was attached as Exhibit 2

to the Petition. Further, the Final Award found that Christian McCoy, individually, was a guarantor of McCoy Excavation, LLC under the Petra Standard Subcontract and that Christian McCoy, individually, confirmed in writing that he agreed to participate in the Arbitration and be bound by the award issued in the Arbitration.

Through the Final Award, the Arbitrator found in favor of Petra and made the following Award in favor of Petra and against McCoy Excavation, LLC and Christian McCoy, jointly and severally:

1. Money damages totaling $393,135.56;
2. $52,765.63 in pre-judgment interest on the Trust Funds converted by McCoy Excavation, LLC and Christian McCoy;
3. $56,406.28 in attorneys' fees and costs; and
4. $8,995.00 for the reimbursement of AAA administrative fees previously incurred by Petra.

Total: $511,302.47

Thus, the Final Award was issued in favor of Petra against McCoy Excavation, LLC and Christian McCoy, jointly and severally, in the amount of $511,302.47.

Respondents have not moved, pursuant to Mont. Code Ann. §§ 27-5-312, -313, to vacate, correct, or modify the Final Award and have not filed a response to Petra's Petition.

**Legal Standard**

The Court has jurisdiction over this matter pursuant to pursuant to § 27-5-322, Mont. Code Ann.

The Court finds that the Eighteenth Judicial District Court is a proper venue pursuant to § 27-5-323, Mont. Code Ann. The address for McCoy Excavation is located in Gallatin County, State of Montana.

The Montana Uniform Arbitration Act sets forth a process for a party to confirm an arbitration award in district court. Section 27-5-311, Mont. Code Ann., provides:

> Upon the application of a party, the district court shall confirm an award unless within the time limits imposed in this chapter grounds are urged for vacating, modifying, or correcting the award, in which case the court shall proceed as provided in 27-5-212 and 27-5-313.

Pursuant to § 27-5-312, Mont. Code Ann., an application to vacate an arbitration award must be made within 90 days after delivery of a copy of the award to the party filing the application to vacate.

**Discussion**

Petra requests this Court confirm the Final Award issued by the Arbitrator in the AAA Arbitration. In support of its Petition, Petra submitted exhibits showing the parties' agreement to participate in arbitration through the AAA. Petra also submitted as an exhibit the Final Award issued by the Arbitrator in the Arbitration. The Final Award noted the agreement by Christian McCoy, individually, to participate in arbitration through the AAA.

Respondents have not filed a response to Petra's petition or otherwise appeared in this matter. Further, Respondents have not filed a motion to vacate the Final Award pursuant to § 27-5-312, Mont. Code Ann., or a motion to modify or correct the Final Award pursuant to § 27-5-313, Mont. Code Ann.

More than ninety (90) days have passed since delivery of the Final Award was completed through the AAA. Thus, the deadline has expired for Respondents to file a motion to vacate the

Final Award pursuant to § 27-5-312, Mont. Code Ann., or a motion to modify or correct the Final Award pursuant to § 27-5-313, Mont. Code Ann.

Accordingly, this Court grants Petra's Petition to Confirm the Arbitration Award. Petra is entitled to a judgment against Respondents, jointly and severally, in the amount of $511,302.47 for the following damages, attorneys' fees and costs, and AAA costs awarded to Petra in the Final Award:

1. Money damages totaling $393,135.56;
2. $52,765.63 in pre-judgment interest on the Trust Funds converted by McCoy Excavation, LLC and Christian McCoy;
3. $56,406.28 in attorneys' fees and costs; and
4. $8,995.00 for the reimbursement of AAA administrative fees previously incurred by Petra.

Pursuant to the Final Award, Petra is also entitled to all applicable post-award interest and post-award attorneys' fees and costs.

IT IS HEREBY ORDERED:

1. Petra's Petition to Confirm Arbitration Award is **GRANTED**.

**ELECTRONICALLY SIGNED AND DATED BELOW**

cc: Matthew A. Haus



Electronically Signed By:
Hon. Judge Rienne H. McElyea
Wed, Nov 29 2023 11:33:24 AM



Exhibit 8